BLOCK, District Judge:
 

 “Withdraw, my lord; I’ll help you to a horse.”
 
 [1]
 

 The United States appeals from a judgment of the District Court for the Northern District of New York (McAvoy, J.) vitiating a tax levy placed by the Internal Revenue Service (“IRS”) on a race horse named Devil His Due as part of its ongoing effort to collect over four million dollars of unpaid income taxes from Robert LiButti (“Robert”). The district court found, after a bench trial, that Robert’s daughter, Edith LiButti (“Edith”), “was the sole owner of Devil His Due at the time it was levied upon” and that the government failed to establish “a nexus between the taxpayer and the property at issue.”
 
 LiButti v. United States,
 
 894 F.Supp. 589, 592, 599 (N.D.N.Y.1995).
 

 On appeal, the government contends that Devil His Due was an asset of Lion Crest Stable (“Lion Crest”) and that “the district court erred by rejecting, as a matter of law, the possibility that by virtue of his financial and operational control over Lion Crest Stable, Robert LiButti had an ownership interest in all of the assets of the stable, including Devil His Due.” In addition, the government argues that the district court erred by refusing to draw any adverse inferences from Robert’s invocation of the Fifth Amendment’s privilege against self-incrimination when questioned about his role in Lion Crest and, particularly, whether his funds were used to acquire Devil His Due.
 

 Edith contends on appeal that Devil His Due is owned by her, not Lion Crest; that “[tjhere is no actual entity, or even any proof that there was any ‘going concern’ under that name;” that “[t]he name ‘Lion Crest Stable’ is merely a fanciful name that [she] used to describe whatever horses she happens to own
 
 *-1463
 
 at the time;” and that “[t]he existence of Lion Crest Stable was not something greater than Edith LiButti.” According to the district court’s decision, Edith claimed at trial “to be the sole proprietor of Lion Crest Stable, the purported owner of Devil His Due,”
 
 LiButti,
 
 894 F.Supp. at 591, and indeed she has brought this lawsuit as “Edith LiButti, doing business as Lion Crest Stable, a sole proprietorship.”
 

 Because we conclude that the district court did not appropriately consider the nature of Edith and Robert’s relationships with Lion Crest and Devil His Due, and further conclude that the district court did not properly consider the circumstances which give rise to the drawing of adverse inferences in a civil action when the Fifth Amendment is invoked, we vacate and remand.
 

 BACKGROUND
 

 In 1977 Robert was convicted of filing false and fraudulent tax returns. Thereafter, the IRS assessed unpaid federal income taxes against him for a number of pre- and post-1977 tax years. As of August 1994, the outstanding balance was $4,395,162.06. The IRS could not locate any assets in Robert’s name that could be seized to satisfy this tax liability. It did, however, locate Devil His Due, a prized thoroughbred race horse which was in Saratoga, New York, preparing to run in the Whitney Handicap under Lion Crest’s colors. Believing Robert, who had an obvious vested interest in secreting his assets, to be the effective owner of Lion Crest and Devil His Due, the IRS issued its levy against Lion Crest’s titular owner, Edith, as her father’s purported nominee, “to the extent of his interest” in Devil His Due. The next day, Edith and the IRS agreed to let the horse run in the Whitney Handicap, and to place any earnings in escrow. Devil His Due finished second, earning $77,000.
 

 Edith has brought this wrongful levy action against the government pursuant to 26 U.S.C. § 7426 to enjoin the IRS from enforcing its levy against Devil His Due, and for the release of its Whitney Handicap race winnings. The district court stated in its decision that under this statute the initial burden of proof rests with the plaintiff to prove title to or ownership interest in the levied property; the burden then shifts to the government to prove by substantial evidence that there is a nexus between the property and the taxpayer; however, “[i]t is the plaintiffs ultimate burden ... to prove that the levy is wrongful and should be overturned.”
 
 LiButti,
 
 894 F.Supp. at 591.
 

 The district court traced Edith’s ownership of Devil His Due from her testimony and various exhibits, “including bills of sale and check stubs from Lion Crest Stable’s checking account.”
 
 Id.
 
 It rejected a number of liability theories advanced by the government in its effort to establish the requisite nexus between Robert and the levied property: nominee, fraudulent conveyance, alter ego, constructive trust. The government’s nominee theory was rejected because “[m]ost importantly, the government did not provide any proof that there was a transfer of Devil His Due from Robert to Edith LiButti.”
 
 Id.
 
 This finding also compelled the'district court to reject the government’s fraudulent conveyance theory.
 
 Id.
 
 at 598 (“[Sjince none of the proof at trial supported that Devil His Due was conveyed from Robert to Edith LiButti, any argument of this theory is mer-itless.”). In respect to its alter ego theory, the government contended that “the proof at trial shows that Robert LiButti is the alter ego of Lion Crest Stable, and thus, since Devil His Due is purportedly owned by Lion Crest, the horse is the property of Robert LiButti.”
 
 Id.
 
 The district court rejected this theory because it could not find any “New Jersey legal authority for the proposition that a sole proprietorship may be subject to the alter ego doctrine.”
 
 Id.
 

 [2]
 

 The district
 
 *-1462
 
 court rejected the government’s constructive trust theory since it believed that it was tied to the rejected alter ego theory.
 
 Id.
 
 at 599. Indeed, there was no proof of an actual transfer of the horse from father to daughter. Moreover, there was no direct proof that the monies Edith used to purchase and, subsequently, repurchase Devil His Due came from her father. The record is replete, however, with evidence of Robert’s use of his daughter and Lion Crest for secreting his assets and as the conduits for his horse dealings, and the use of Lion Crest to support the affluent lifestyle to which he had become unaccountably accustomed. The record is also replete with questions pointedly posed to Robert about these matters and the funding of the purchases of Devil His Due, which triggered his invocation of the Fifth Amendment.
 

 A. The District Court’s Findings
 

 1. Edith’s Ownership of Devil His Due
 

 The district court found that Edith purchased Devil His Due in November 1989 from a disinterested party for $25,000, and that she sold it shortly thereafter, on February 26, 1990, to her ex-husband, George Najemian (“Najemian”), for $45,000. On that same date, Najemian sold a 10 percent interest to Robert McGirr (“McGirr”). He sold a 25 percent interest on the following day to Edward Darella (“Darella”), and another 25 percent interest on the next day to George and Richard Greeley (“the Gree-leys”). Najemian retained the remaining 40 percent interest.
 

 As further explained by the district court, Edith reacquired title to Devil His Due during 1992-93 by (1) trading her interest in a colt of “Turkoman” and “Solicitous” for the 40 percent interest her ex-husband had retained; (2) trading her interest in a horse named “Litigation Rex” for Darella’s 25 percent interest; (3) trading her ownership of a horse named “Easy Magic” to McGirr for his 10 percent interest; and (4) paying the Gree-leys $100,000 for their 25 percent interest.
 

 The district court found that Edith purchased her interests in the Turkoman/Solici-tous colt and Easy Magic for $20,000 and $50,000, respectively; that she used her mother as a conduit to purchase Litigation Rex for her with monies which Edith loaned to her mother; and that the $100,000 Edith paid to the Greeleys was borrowed from a friend, who she repaid after Devil His Due won a major race. Notably, the district court made no findings as to the underlying source of funds for the equine interests which Edith conveyed as partial consideration for her reacquisition of Devil His Due; nor did the district court make any findings as to the source of the $25,000 for the initial purchase of Devil His Due.
 

 In all of these sales and purchases, title to the horses, including Devil His Due, was set forth in the underlying documents either in the name of “Edith LiButti (Lion Crest Stable)” or “Lion Crest Stable (Edith LiButti).”
 

 2. The Absence of Proof of Robert’s Interest In Devil His Due
 

 In contrast to the details of the various purchase and sales transactions which Edith produced in support of her ownership claim to Devil His Due, the district court concluded that the government produced only scant, inconclusive evidence of any direct ownership interest by Robert in the horse. This came from a gratuitous witness, Stewart Welch (“Welch”), who testified to certain telephone conversations he purportedly had with Edith because he was desirous of purchasing an interest in Devil His Due. As he recalled, Edith told him that she, Robert, and a Bob Fox (“Fox”) had ownership interests in Devil His Due; that a 25% interest was for sale for approximately $700,000; and that Fox would be the person to speak to about the possibility of a sale. Welch further testified that he then spoke with Fox by telephone; that after being told by Fox that a 25% interest would cost $750,000, he faxed a copy of a sales agreement to Fox, listing Fox as the agent for Lion Crest; that he believed Fox had an agency interest in Devil His Due; and that
 
 *-1461
 
 Fox never signed the agreement in order to sell the horse elsewhere. The district court did not credit Welch’s testimony as sufficient to establish that Robert had an ownership interest in Devil His Due, commenting,
 
 inter alia,
 
 that “this testimony did not show what percentage of ownership Robert LiButti held in Devil His Due.”
 
 LiButti,
 
 894 F.Supp. at 593.
 

 3. Robert’s Dealings With Edith and Lion Crest
 

 In recounting the evidence adduced at the trial concerning Robert’s dealings with his daughter and Lion Crest, the district court’s focus was clearly on whether this evidence established any connection between Robert and Devil His Due. In that context, the district court analyzed (1) the testimony of an IRS agent as to the tracing of funds in the Lion Crest checking account; (2) a 75 percent security interest in the breeding rights of Devil His Due which Edith gave to her mother, Joan LiButti (“Joan”); (3) transactions surrounding the purchase in 1989 of a house at 2 Pell Farm Road, Saddle River, New Jersey in which Robert and Joan lived; (4) certain transactions at the Urban National Bank during the 1980s; (5) transactions pertaining to the ownership and leasing of a number of horses during the 1980s; and (6) Robert’s purchase of a particular horse, named Slick, in 1988. In each instance, the district court concluded that the government failed to establish any nexus between Robert and the levied property, Devil His Due.
 

 As acknowledged by the district court, the IRS agent testified “that just prior to Lion Crest’s 1989 purchase of Devil His Due, Robert LiButti deposited two checks in the amounts of $85,000 and $100,000 into Lion Crest’s bank account.”
 
 LiButti,
 
 894 F.Supp. at 593. In discounting this testimony, the district court concluded that this government witness failed to show how these funds, as well as other funds of Robert which she traced into Lion Crest’s bank account, “were commingled in the account with other money.”
 
 Id.
 
 Furthermore, the district court noted that the two checks were credited against an $800,000 loan balance which Robert purportedly owed his daughter at that time.
 

 In regard to the security interest, the district court found that it was “unusual” for Edith to give her mother an interest in the breeding rights of Devil His Due since Joan consistently owed money to her daughter, and that there probably existed a $70,000 loan balance owed by Joan to Edith when the security interest was executed. Nonetheless, the district court concluded that “the peculiarity of this transaction does not present evidence that Robert LiButti was involved in the transaction or that it gave Robert LiButti any ownership interest in Devil His Due.”
 
 Id.
 
 at 594.
 

 The home at 2 Pell Farm Road in which Robert and Joan resided also served as Lion Crest’s office. Prior to its purchase, it was leased. Both the lease and title to the property were placed in Edith’s name. Although she admittedly had no interest in the house, and never lived there, the leasehold rent was paid by Lion Crest, as were taxes and payments after it was purchased. Moreover, a Lion Crest cheek was given for a purchase option. When this check bounced, Robert then paid $150,000 towards the acquisition of the house. He also entered into a contract to sell a horse for $400,000 to further finance the purchase of the house but assigned his interest in the contract to Edith to purportedly reduce his loan balance with her by this amount; and entered into another contract to repurchase this horse at a later date for basically that same sum. While the district court recognized that all these machinations showed a tight financial connection between Robert and Edith regarding the purchase of the house, and a nexus between Robert and this property, it concluded that “this nexus does not establish any nexus between Robert LiButti and Devil His Due.”
 
 Id.
 
 at 595.
 

 During the 1980s, Robert consistently borrowed monies from Urban National Bank in Edith’s name. These funds were used by Lion Crest to purchase horses. When Lion Crest later sold the horses, the sale proceeds were deposited into Lion Crest’s checking account. The underlying loan documents and some checks were signed by Edith but, as noted by the district court, “[h]er testimony shows that she did not review the documents before signing them and that she did
 
 *-1460
 
 not know their contents.”
 
 Id.
 
 Other checks were signed in Edith’s name by a bank employee at Robert’s direction. Nonetheless, the district court saw no significance in all of this since “[t]he government made no connection at trial between these funds and those used to purchase Devil His Due.”
 
 Id.
 

 Nor did the district court place any stock in the leases and sales of a number of horses from Lion Crest to the President of Urban National Bank, and sale-backs for the same amounts as the purchase prices, since “the government provided no evidence that any such arrangement was made as to Devil His Due.”
 
 Id.
 
 The district court also considered irrelevant that in 1987 Lion Crest purportedly sold a horse to Robert for $400,000; he resold the horse that same day for $1,000,-000; and rather than pay Lion Crest any monies, he simply increased his loan balance with Edith by $400,000. Once again, the district court’s rationale was that there was no showing of “a connection between Robert LiButti and Devil His Due.”
 
 Id.
 
 at 596.
 

 B. Other Aspects of the Trial Record
 

 There are certain parts of the trial record not referred to in the district court’s decision which raise serious questions as to Edith’s financial capacity to purchase and repurchase Devil His Due and, in general, to finance the operations of Lion Crest. There is also evidence in the trial record of Robert’s financial control over and interest in the sale of Devil His Due to Edith’s ex-husband, Najemian. Moreover, the trial record is replete with evidence of Robert’s domination of Lion Crest and his ubiquitous use of Lion Crest’s bank account as his own. Since the district court should consider these aspects of the record in the context of our remand, we set forth a number of them at this time.
 

 1. Edith’s Financial Wherewithal
 

 Edith’s account of her financial resources and means for funding Lion Crest and its horses is culled from a variety of testimonial and evidentiary sources, which are all part of the record: her trial and deposition testimony in the subject litigation; her grand jury testimony in 1993, which culminated in another criminal prosecution against her father and his convictions in 1994 on various income tax and bank fraud charges; her deposition testimony in civil litigation brought against her in 1988 by Urban National Bank; and a sworn “Certification in Support of Motion to Increase Support” which she submitted in 1988 to the Superior Court of New Jersey in an effort to obtain increased support payments from her ex-husband. Collectively, they show her and Lion Crest to be a veritable financial conduit for her father’s race horse business.
 

 Edith was seventeen when she opened Lion Crest with, purportedly, her own savings. She was subsequently denied a license by the New York State Racing and Wagering Board because she did not know the source of the funds she used to start Lion Crest. During the 1970s she attended school at the New York Institute of Technology, did some modeling, and worked at Bamburger’s “out of boredom.” Although she testified that she was the sole owner of Lion Crest, she did not even know whether it was incorporated.
 

 The funding which Lion Crest received during the 1980s from Urban National Bank on the strength of Edith’s signature was in the millions. The notes that she would sign at her father’s behest were a frequent occurrence; for a period of a year or two this happened once or twice a week. Moreover, a secretary for the bank signed Edith’s name to a loan for possibly as much as $1,125,000. Edith had “no idea” what this money was for. Edith knew, however, that her father had significant tax liabilities, was under constant investigation, and could not hold property in his own name.
 

 The loans which Lion Crest carried on its books for Robert’s account ran from 1984-92, at which time they amounted to $1,013,-572.64. On November 17, 1988, a year before Devil His Due was purchased, Robert owed Lion Crest $1,048,500. Just one month before, in her certification for increased support from her ex-husband, Edith had sworn in that judicial document that both she and Lion Crest were destitute:
 

 I am in desperate financial straights. I have no assets of any kind other than the
 
 *-1459
 
 furniture in the house. I have sold whatever horse inventory I had in my business to help pay off some of my obligations. I have nothing left in the business. I have substantial debts. * * * I am not able to make ends meet....
 

 One year later, after Robert had deposited $185,000 into Lion Crest’s bank account and reduced his loan balance to about $800,000, Lion Crest had sufficient funds to purchase Devil His Due. It also had monies left over for the $70,000 needed in 1991 to purchase Easy Magic and an interest in the Turko-man/Solieitous colt.
 

 2. Robert’s Control Over Devil His Due
 

 The record is replete with evidence of Robert’s insinuation into the business of Lion Crest. For example, Howard Crowell, a horse trainer, testified that he would report to Robert when Lion Crest’s horses got sick, and that he was instructed by Robert to examine horses for possible purchase by Lion Crest. In addition, Najemian testified that it was his ex-father-in-law, not his ex-wife, who was Lion Crest’s driving force. More pointedly, Najemian testified that he purchased Devil His Due from Robert; not from Edith:
 

 Q. How did you come to learn that that horse could be purchased?
 

 A. Occasionally I would call my ex-father-in-law. We decided to bury the hatchet, so to speak, as a result of the divorce and he said, Look, you know, your kids are my grandchildren and I guess we — you know, we can all learn to live together here. So I didn’t see a real good prospect of my staying in the horse business if I couldn’t talk to him.
 

 So occasionally I would call him and ask him what did — what was an inventory that was for sale, or sometimes he would call me and say, There are several horses that would be for sale. Are you interested or do you know anybody that’s interested in purchasing horses?
 

 Q. And is that how you came to learn that you might be able to buy an interest in Devil His Due?
 

 A. That’s how I came to learn that a 1989 colt by Devil's Bag out of Plenty O’Toole [Devil His Due] was for sale.
 

 Q. And how did you go about negotiating the purchase price for that horse?
 

 A. I said, how much could I buy him for? Q. You asked Robert LiButti?
 

 A. Well, what was the price.
 

 Q. And what did he say?
 

 A. I don’t recall specifically.
 

 Q. But it was you eventually decided on $45,000?
 

 A. Correct.
 

 3. Robert’s Personal Use Of Lion Crest’s Funds
 

 Edith’s purchase of the Pell Farm Road house in 1989 was not the first time that Lion Crest was implicated in providing housing for her parents. In 1984 Edith purchased a house at 183 Saddle River Road for $600,000, and in 1985 “Edith LiButti Va Lion Crest Stables” deeded it to her mother, who hadn’t worked for 25 years, for $900,000. Edith acknowledged that Robert selected the house, told her when to buy it, and instructed her to deed it to her mother. Edith could not recall the source of the funds she used to purchase the house. She did recall, however, that Lion Crest paid for the utilities, the leasing of two automobiles for her father, including a 1995 Mercedes, Robert’s cellular phone bills, and his American Express bills, which during 1991 through 1994 totaled $192,558.25. She also paid her father’s legal fees from the sale of Lion Crest horses.
 

 C. Robert’s Invocation of the Fifth Amendment
 

 In addition to his 1977 conviction, Robert was sentenced on December 2, 1994 by the United States District Court, District of New Jersey, to a 36-month period of incarceration after having been found guilty on income tax and bank fraud charges. Eighteen days later, on December 20th, his deposition was taken for the present case. Eighty-four
 
 *-1458
 
 questions were posited to him. He refused to answer any of them, including:
 

 *Do you have any interest in Devil His Due?
 

 *Do you own Devil His Due?
 

 *Have you ever owned Devil His Due?
 

 *Is it true that you’ve controlled all of Lion Crest business since at least 1980?
 

 *Is it true that you’ve made all the management decisions for Devil His Due?
 

 *Is it true that your money went to purchase Devil His Due the first time that he was purchased by Lion Crest Stables?
 

 *Is it true that your money went to purchase Devil His Due the second time it was purchased by Lion Crest Stable?
 

 DISCUSSION
 

 A. Burden of Proof
 

 We have not had occasion to pass upon the relative burdens governing wrongful levy litigation under § 7426. Congress has not given any statutory guidance. It has simply provided that “[i]f a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.” 26 U.S.C. § 7426(a)(1). Relying upon district court authority, the district court adopted a tri-partite burden analysis, requiring initially for the plaintiff to ‘“prove title to or an ownership interest in the property levied upon,’ ” whieh would thereupon shift the burden to the government “to prove by ‘substantial evidence’ that there is a nexus between the property and the taxpayer.”
 
 LiButti,
 
 894 F.Supp. at 591 (quoting
 
 Marshall v. United States,
 
 831 F.Supp. 988, 997 (E.D.N.Y.1993)). If the government satisfied that substantial evidence burden, meaning that the evidence was “‘considerably more than a preponderance but less than clear and convincing proof,’ ” the plaintiff would have the “ultimate burden” to prove that the levy was wrongful.
 
 LiButti,
 
 894 F.Supp. at 591 (quoting
 
 Nelson v. United States,
 
 821 F.Supp. 1496, 1501 (M.D.Ga.1993)).
 

 In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.
 

 We note that there may be difficulties with the district court’s analysis because it seems to shift the burden of proof (that is, the risk of nonpersuasion) to the government at the second step of the process, despite the fact that such a shift would appear to be proscribed by Fed.R.Evid. 301 in cases where, as here, an unrebutted presumption would support a party’s claim.
 
 [3]
 
 The other circuits to address the issue may also have implied that the burden of proof, as opposed to the burden of production, shifts to the government at the intermediate step.
 
 See Century Hotels v. United States,
 
 952 F.2d 107, 109 (5th Cir.1992);
 
 Ballard v. United States,
 
 17 F.3d 116, 119 n. 2 (5th Cir.1994);
 
 Security Counselors, Inc. v. United States,
 
 860 F.2d 867, 869 (8th Cir.1988);
 
 Flores v. United States,
 
 551 F.2d 1169, 1175 (9th Cir.1977);
 
 Morris v. United States,
 
 813 F.2d 343, 345 (11th Cir.1987);
 
 Valley Finance, Inc. v. United States,
 
 629 F.2d 162, 171 n. 19 (D.C.Cir.1980). Further complicating matters, these circuits have differed amongst themselves as to the amount of evidence that the government must bring to meet its burden.
 
 Compare Valley Finance,
 
 629 F.2d at 171 n. 19 (“[T]he government must establish its asserted nexus between the taxpayer and a third party by substantial evidence.”),
 
 and Century Hotels,
 
 952 F.2d at 109 (“If the IRS proved a nexus by substantial evidence, [plaintiff] then had the ultimate burden of proving the levy was wrongful.”),
 
 with Flores,
 
 551 F.2d at 1176 n. 8 (“We are not here faced with a situation in which the Government demonstrates a nexus between the taxpayer and the property by a preponderance of the evidence_”). However, since the government does not challenge the
 
 *-1457
 
 district court’s treatment of the burden shifting in this ease, and since, as discussed below, the government has clearly brought forth enough evidence of a nexus to meet its burden no matter how it is conceived and regardless of what the proper standard may be, we have no occasion to address these questions here.
 

 B. Issue Analysis
 

 The district court’s decision was clearly bottomed on the government’s inability to establish a transfer of Devil His Due from Robert to Edith. Under this view of the case, Robert’s involvement with the business of Lion Crest was of no moment. If indeed, as Edith claims, “[t]here is no actual entity, or even any proof that there was any ‘going concern’ under that name,” the issue would simply be whether Edith owned Devil His Due as Robert’s nominee, and proof of transfer would be an essential concern. As such, in the absence of drawing any adverse inferences from Robert’s refusals to answer whether he ever owned or paid for the acquisition and reacquisition of Devil His Due, the district court’s finding that Edith was holding the horse as Robert’s nominee could not be viewed as clearly erroneous.
 
 See, e.g., Pinnacle Consultants, Ltd. v. Leucadia Nat’l Corp.,
 
 101 F.3d 900, 906 (2d Cir.1996) (district court findings of fact are reviewed under the clearly erroneous standard).
 

 If, however, Lion Crest was a viable business entity and Devil His Due was one of its assets, the analysis becomes a horse of a different color. Regardless of the form of the entity, ownership of the entity would carry with it, at least presumptively, ownership of its assets. Thus, if Lion Crest had been incorporated, veil-piercing under alter ego analysis would be available to reach the corporation’s assets. This type of piercing the corporate veil is commonly referred to as “reverse piercing,” which occurs “when assets of the corporate entity are used to satisfy the debts of the controlling alter ego.”
 
 Century Hotels v. United States,
 
 952 F.2d 107, 110 n. 6 (5th Cir.1992);
 
 see also
 
 I.W. Fletcher, Cyclopedia of the Law of Private Corporations § 41.70 at 706-09 (rev.perm.ed. 1990);
 
 Towe Antique Ford Found, v. Internal Revenue Service,
 
 999 F.2d 1387, 1390 (9th Cir.1993) (“[C]ourts have permitted the use of a ‘reverse piercing’ theory to allow the United States to recover a taxpayer’s delinquent tax liability from his alter ego business entity.”);
 
 Shades Ridge Holding Co. v. United States,
 
 888 F.2d 725, 728 (11th Cir.1989) (same);
 
 Valley Finance,
 
 629 F.2d 162, 171-72 (same). A legitimate corporation may, of course, hold a particular asset for an individual as a nominee.
 
 See, e.g., United States v. Miller Bros.,
 
 505 F.2d 1031, 1036 (10th Cir. 1974) (asset of corporation reached to satisfy taxpayer’s liability without need for corporate veil-piercing where taxpayer retained beneficial interest and exerted dominance and control over asset).
 

 The factors employed under alter ego analysis are essentially designed to attack the corporate structure, such as “the intermingling of corporate and personal funds, under-capitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors.”
 
 Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,
 
 98 F.3d 13, 18 (2d Cir.1996). It is, therefore, not surprising that the district court could not find any New Jersey law applying alter ego analysis to sole proprietor-ships.
 

 Nonetheless, it should be patently obvious that if Robert dominated and controlled Lion Crest he should not be able to escape his tax liabilities simply because it was not incorporated, and he chose, instead, to constitute his daughter as his unincorporated business’ nominee. In either event, “we must avoid an over-rigid ‘preoccupation with questions of structure,”’
 
 id.
 
 (quoting
 
 William Wrigley Jr. Co. v. Waters,
 
 890 F.2d 594, 601 (2d Cir.1989)), and “apply the preexisting and overarching principle ‘that liability is imposed to reach an equitable result.’”
 
 Id.
 
 (quoting
 
 Brunswick Corp. v. Waxman,
 
 599 F.2d 34, 36 (2d Cir.1979)).
 

 It was incumbent on the district court to determine, therefore, (1) whether Lion Crest was an operational business; (2) if so,
 
 *-1456
 
 whether Devil His Due was an asset of Lion Crest; and (3) if so, whether Robert was the effective owner of Lion Crest, and in an effort to secrete his ownership made Edith the business’ nominee. Since the “[p]roperty of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer’s tax liability,”
 
 Shades Ridge,
 
 888 F.2d at 728 (citing
 
 G.M. Leasing Corp. v. United States,
 
 429 U.S. 338, 350-51, 97 S.Ct. 619, 627-28, 50 L.Ed.2d 530 (1977)), all of the government’s evidence showing a nexus between Robert and the business of Lion Crest was certainly relevant, and Edith’s ultimate burden, assuming Lion Crest was a business entity, was to prove by a preponderance of the evidence that she was either the true owner of Lion Crest or that Devil His Due was not one of Lion Crest’s assets.
 

 While these issues are best left for the trier of the facts in the first instance, we note that Edith’s contention that Lion Crest was neither an actual entity nor a going concern strikes us as quite remarkable in light of the fact that she has brought her lawsuit as “Edith LiButti, doing business as Lion Crest Stable, a sole proprietorship,” and the rather overwhelming evidence of the use of Lion Crest’s checking account throughout the years for the payment of its business expenses, the maintenance of Lion Crest’s office in Robert’s home, the funding of and borrowing from Lion Crest’s accounts by Robert, and the numerous bank transactions which Edith engaged in at Robert’s behest to support Lion Crest’s business. Furthermore, the evidence of Robert’s insinuation into Lion Crest’s affairs, the use of Lion Crest’s funds to support his affluent lifestyle, and his insidious domination over his daughter, would undoubtedly lend support to a finding by the district court that Lion Crest existed as a separate entity and was Robert’s nominee. Any adverse inference that would be drawn from Robert’s refusal to answer whether it was true “that you’ve controlled all of Lion Crest business since at least 1980,” would only reinforce such a finding, as would, of course, adverse inferences drawn from Robert’s refusals to answer the questions about his payments for and ownership of Devil His Due.
 

 C. Adverse Inferences
 

 It is not clear from the district court’s decision whether it believed it was precluded as a matter of law from drawing an adverse inference against Edith by reason of her father’s invocation of his privilege against self-incrimination because of his non-party status (“The government has not provided any cases in which a non-party witness’ invocation of his Fifth Amendment privilege has resulted in drawing an adverse interest
 
 [sic
 
 ] against a party where the non-party witness was not in some way a former member or employee of the party at issue.”); whether the district court would, in any event, have refused to draw such an inference in the exercise of its discretion (“[The case cited by the government] did not hold that a court, in deciding a bench trial, is required to draw a negative inference against a non-party witness who has invoked the Fifth Amendment.”); or whether the district court had concluded that the inference would have been the only evidence against Edith and, accordingly, could not suffice to defeat her lawsuit (“[I]t is far less likely to be proper to allow a non-party’s refusal to testify to be the only support for an adverse inference against a party to the suit.”).
 
 LiButti,
 
 894 F.Supp. at 596-97. The district court’s equivocation is understandable in light of the undeveloped posture of the law pertaining to adverse inferences when non-party witnesses invoke the Fifth Amendment in civil litigation.
 
 See generally
 
 Charles H. Rabón, Jr., Note,
 
 Evening The Odds In Civil Litigation: A Proposed Methodology For Using Adverse Inferences When Non-Party Witnesses Invoke The Fifth Amendment,
 
 42 Vand.L.Rev. 507 (1989); Dennis J. Bartlett, Note,
 
 Adverse Inferences Based On Non-Party Invocations: The Real Magic Trick In Fifth Amendment Civil Cases,
 
 60 Notre Dame L.Rev. 370 (1985); Robert Heidt,
 
 The Conjurer’s Circle
 
 — The
 
 Fifth Amendment Privilege In Civil Cases,
 
 91 Yale L.J. 1062 (1982).
 

 In
 
 Brink’s Inc. v. City of New York,
 
 717 F.2d 700 (2d Cir.1983), we traced the history leading to the enactment by Congress in 1974 of Fed.R.Evid. 501, noting that in rejecting rules promulgated by the Supreme Court, including Standard 513(a), which
 
 *-1455
 
 would have precluded the drawing of any adverse inference in any litigation, civil or criminal, from the assertion of a privilege, “ ‘Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis, ... and to leave the door open to change.’ ”
 
 Id.
 
 at 708 (quoting
 
 Trammel v. United States,
 
 445 U.S. 40, 47, 100 S.Ct. 906, 911, 68 L.Ed.2d 186 (1980)) (internal quotation marks omitted).
 

 Shortly after the enactment of Fed. R.Evid. 501, the Supreme Court made it clear in
 
 Baxter v. Palmigiano,
 
 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), that while the Fifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it “does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.”
 
 Id.
 
 at 318, 96 S.Ct. at 1558. This is so even though, as in
 
 Baxter,
 
 the government is a party to the action and would benefit from the drawing of the inference.
 
 See United States v. Ianniello,
 
 824 F.2d 203, 208 (2d Cir.1987) (holding that adverse inference may be drawn from the assertion of Fifth Amendment privilege in civil RICO actions brought by government).
 

 Although
 
 Baxter
 
 focused on the invocation of the privilege by parties, “[a] non-party’s silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree.”
 
 RAD Servs., Inc. v. Aetna Casualty & Sur. Co.,
 
 808 F.2d 271, 275 (3d Cir.1986). Accordingly, we were free to determine in
 
 Brink’s
 
 whether the plaintiffs ex-employees’ claims of privilege were admissible and competent evidence under the circumstances of that case. In so holding, we adopted the rationale of Professor Heidt that the ex-employees’ refusals to testify could appropriately be conceptualized “as vicarious admissions of their former employer.”
 
 Brink’s,
 
 717 F.2d at 710 (citing Heidt, 91 Yale L.J. at 1119-20 n. 214). Having found no constitutional or other legal impediment that would preclude admissibility under Fed.R.Evid. 402 (“All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.”), we then analyzed this evidence under Fed.R.Evid. 403 and determined that the trial court correctly concluded that it was not “ ‘substantially outweighed by the danger of unfair prejudice.’”
 
 Brink’s,
 
 717 F.2d at 710 (quoting Fed.R.Evid. 403).
 

 While
 
 Brink’s
 
 addressed the invocation of the privilege against self-incrimination by non-party ex-employees, our holding there was not intended to be preclusive. To the contrary, true to the spirit of Fed.R.Evid. 501, calling for the exercise by the courts of “reason and experience” in interpreting the principles of the common law governing the privileges of a witness, and Congress’ express intent that the courts be afforded “ ‘the flexibility to develop rules of privilege on a case-by-ease basis,’ ”
 
 id.
 
 at 708 (quoting
 
 Trammel,
 
 445 U.S. at 47, 100 S.Ct. at 911), we recognized in
 
 Brink’s
 
 “the difficulty, and perhaps the undesirability, of a bright line rule against drawing inferences from a failure to testify in the context of civil proceedings.”
 
 Id.
 
 Accordingly, as in
 
 Brink’s,
 
 the circumstances of a given case, rather than the status of a particular non-party witness, is the admissibility determinant.
 
 [4]
 

 This view finds conceptual support in the decisions of the three other circuit courts that have grappled with the issue.
 
 RAD Servs., Inc.,
 
 808 F.2d 271 (3d Cir.1986);
 
 Federal Deposit Ins. Corp. v. Fidelity & Deposit Co.,
 
 45 F.3d 969 (5th Cir.1995);
 
 Cerro Gordo Charity v. Fireman’s Fund Am. Life Ins. Co.,
 
 819 F.2d 1471 (8th Cir.1987);
 
 Rosebud Sioux Tribe v. A & P Steel, Inc.,
 
 733 F.2d 509 (8th Cir.1984).
 

 In
 
 RAD Servs., Inc.,
 
 the plaintiff sued under an insurance policy to recover costs
 
 *-1454
 
 incurred in disposing of hazardous waste materials. In disavowing coverage, the defendant insurance company’s attorney read to the jury deposition testimony of an official and a managing employee of the plaintiff corporation wherein they each invoked their Fifth Amendment privilege. The district court permitted the jury to draw adverse inferences. In affirming, the Third Circuit recognized that it was not clear whether these witnesses were employees of the plaintiff at the time of their depositions since they asserted their privilege in response to questions concerning their employment status. Nonetheless, the court held that “the mere fact that the witness no longer works for the corporate party should not preclude as evidence his invocation of the Fifth Amendment.”
 
 RAD Servs., Inc.,
 
 808 F.2d at 275. The court’s rationale was bottomed on Professor Heidt’s observation that “‘[a]ny factors suggesting that a former employee retains some loyalty to his former employer— such as the fact that the employer is paying for his attorney,’ ” would serve the necessary purpose of “ ‘reduc[ing] the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable.’ ”
 
 Id.
 
 at 276 (quoting Heidt, 91 Yale L.J. at 1119 n. 214). Recognizing the potential for lawyer abuse as expressed by Judge Winter in his dissent in
 
 Brink’s,
 
 such as numerous fact-specific questions by which the examining attorney effectively testifies for the invoking witness, the court noted, simply, that “[t]he trial judge maintains discretion under Fed.R.Evid. 403 to control the way in which non-party claims of privilege reach the jury.”
 
 Id.
 
 at 277. The court was satisfied that the district court properly exercised such discretion.
 

 In
 
 Rosebud Sioux Tribe,
 
 the Tribe sued the defendant for damages arising out of a contract to develop an irrigation system. In an attempt to establish a conspiracy amongst the defendant and others to defraud the Tribe, the plaintiff deposed the chairman of the corporation which administered the Tribe’s land. However, his deposition testimony was harmful to the plaintiffs case. In addition, he stated that if called by the Tribe to testify at trial, he would invoke the Fifth Amendment. At the trial, the district court allowed the defendant to read this deposition testimony to the jury, but would not permit the plaintiff to call the deponent as a witness to assert the Fifth Amendment before the jury. In reversing, the Eighth Circuit, relying on
 
 Brink’s,
 
 recognized that the circumstances of a given case, rather than “a bright-line rule for use in all civil cases,” should govern the admissibility of adverse inferences in keeping with the underlying objectives of the Federal Rules of Evidence and the Federal Rules of Civil Procedure “to secure fairness in the administration of justice; to guarantee that the truth would be ascertained and proceedings would be determined justly.”
 
 Rosebud Sioux Tribe,
 
 733 F.2d at 522-23 (citing Fed.R.Evid. 102). Accordingly, the court held that “given the circumstances presented in this case” the Tribe should have been permitted to call the recalcitrant non-party deponent to the witness stand to avoid the manipulation of the rules of evidence for purposes of “obscuring the truth.”
 
 Id.
 

 The Eighth Circuit elaborated upon and reinforced its
 
 Rosebud Sioux Tribe
 
 holding in
 
 Cerro Gordo Charity:
 
 “The court in
 
 Rosebud
 
 declined to announce any blanket rule legitimizing all attempts to require a witness to invoke the privilege in the presence of the jury.... Likewise, we announce no such rule in this case, preferring instead to consider these questions on a ease-by-case basis.”
 
 Cerro Gordo Charity,
 
 819 F.2d at 1481 (citation omitted). There, the non-party witness controlled the plaintiff charity organization at the time it sued to collect on certain contested death and dismemberment insurance policies on the life of the non-party witness’ half-sister. Although the non-party witness was no longer involved officially with the charity at the time of trial, the trial court permitted the defendant to call him as a witness knowing that he would invoke his Fifth Amendment privilege against self-incrimination before the jury in response to questions implicating him in his half-sister’s death. While viewing the non-party witness’ former position as a voting member of the plaintiff charity as similar to the non-party ex-employees’ in
 
 RAD
 
 and
 
 Brink’s,
 
 the circuit court, in sustaining the trial court’s rul
 
 *-1453
 
 ing, did not base its decision on his status. Rather, it focused on three factors that permitted the drawing of an adverse inference under the circumstances of that case: (1) it was unlikely that the non-party witness would invoke the privilege solely for the purpose of harming the charity since he was a controlling member of the charity at the time the suits were brought; (2) the invocation of the privilege was not the exclusive factor for the jury to consider in determining whether a fraud had been committed since there was other evidence presented at trial implicating the non-party witness in defrauding the insurance companies; and (3) the non-party witness, similar to the non-party deponent in
 
 Rosebud,
 
 was “a key figure” since his actions formed the very basis for the affirmative defense of fraud. Accordingly, the court then considered whether the trial court appropriately determined under Fed.R.Evid. 403 that the probative value of the evidence substantially outweighed any danger of unfair prejudice to the plaintiff, and ruled that the non-party’s invocation of the privilege “made it more probable that [he] had committed the acts in question.”
 
 Id.
 
 at 1482.
 

 Most recently, the Fifth Circuit in
 
 Federal Deposit Ins. Corp.,
 
 a case where the invoking non-party witnesses were neither employees, ex-employees nor members of any of the parties to the litigation, adopted what it perceived to be the underlying holding of
 
 Cerro Gordo, RAD
 
 and
 
 Brink’s
 
 — that “district courts will have to evaluate these situations
 
 on
 
 a case-by-ease basis” — and stated outright that “we refuse to adopt a rule that would categorically bar a party from calling, as a witness, a non-party who had no special relationship to the party, for the purpose of having that witness exercise his Fifth Amendment right.”
 
 Federal Deposit Ins. Corp.,
 
 45 F.3d at 978. In so holding, the court allowed an adverse inference to be drawn from the invocation of the privilege against self-incrimination by witnesses who had received allegedly fraudulent bank loans which contributed to the bank’s demise. The inference was used to support liability against the surety of the bank for the fraudulent loans made by the bank’s chief lending officer. The court did note, however, that the jury was properly instructed not to find liability against the surety for these loans absent evidence corroborating the relationships that existed between the invoking witnesses and the bank’s lending officer.
 

 Although the issue of the admissibility of a non-party’s invocation of the Fifth Amendment privilege against self-incrimination in the course of civil litigation and the concomitant drawing of adverse inferences appropriately center on the circumstances of the case, the evolving ease law and its underlying rationale accordingly suggest a number of non-exclusive factors which should guide the trial court in making these determinations:
 

 1. The Nature of the Relevant Relationships:
 
 While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness’ loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.
 

 2. The Degree of Control of the Party Over the Non-Party Witness:
 
 The degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed.R.Evid. 801(d)(2), and may accordingly be viewed, as in
 
 Brink’s,
 
 as a vicarious admission.
 

 3. The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation:
 
 The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.
 

 A
 
 The Role of the Non-Party Witness in the Litigation:
 
 Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of
 
 *-1452
 
 its underlying aspects also logically merits consideration by the trial court.
 

 Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth.
 
 See, e.g., Idaho v. Wright,
 
 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990) (analyzing the admissibility of a hearsay statement under Fed.R.Evid. 803(24)) (“We agree that ‘particularized guarantees of trustworthiness’ must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief.”).
 

 Clearly, the circumstances of this case compel the admissibility and consideration by the trial court of Robert’s refusals to answer the questions addressed to him that struck directly at the only issue before the court — whether he or his daughter was the effective owner of Lion Crest and/or Devil His Due. In addition to the strength of their relationship and their indiscriminate manipulations of Lion Crest’s monies and business affairs, Robert and Edith had precisely the same interest against the drawing of adverse inferences from Robert’s invocation of the Fifth Amendment: their collective desire that Devil His Due and all of Lion Crest’s assets be deemed in Edith’s ownership so that they would be insulated from levy by the government. If Robert truly believed that he neither owned Lion Crest and/or Devil His Due nor contributed the funds to acquire the horse, he simply could have answered the questions posed to him about those matters in the negative. His apparent desire to guard against perjury or prosecution for criminally secreting his interests in Lion Crest and Devil His Due should not serve the further purpose of precluding the IRS from reaching his hidden assets.
 

 Nonetheless, we leave it to the district court on remand to determine in the first instance to what extent adverse inferences should be drawn in respect to the questions posited to Robert at his deposition which he refused to answer. Since we have ruled on the issue of admissibility, the district court should now evaluate the relevance of Robert’s refusals and their probative value under Fed.R.Evid. 403, and the weight they should be accorded in the context of all of the other evidence.
 
 See Federal Deposit Ins. Corp.,
 
 45 F.3d at 977 (“The admissibility of a non-party’s exercise of the Fifth Amendment against a party ... is a legal question that we must review
 
 de novo.
 
 Nevertheless, if such evidence is not inadmissible as a matter of law, the district court’s specific determination of relevance and its evaluation of a potential Fed.R.Evid. 403 problem are reviewed for abuse of discretion.”). In making its 403 determination, the district court is not here burdened with concerns about jury prejudice. Indeed, many of the management problems which a trial court invariably has to wrestle with in order to guard against unfair prejudice when one takes the proverbial Fifth simply do not exist in the context of a bench trial.
 

 As for the weight to be accorded to adverse inferences, the district court should be mindful of Justice Brandéis’ classic admonition: “Silence is often evidence of the most persuasive character.”
 
 United States ex rel. Bilokumsky v. Tod,
 
 263 U.S. 149, 153-54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923),
 
 quoted with approval in Baxter,
 
 425 U.S. at 319, 96 S.Ct. at 1558. While the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case, “the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.”
 
 United States v. 4003-4005 5th Ave.,
 
 55 F.3d 78, 83 (2d Cir.1995). This is in contrast to those situations where a serious penalty is sought against a person for exercising the privilege against self-incrimination, such as loss of public office or employment.
 
 See Lefkowitz v. Cunningham,
 
 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977) (loss of political office) (reaffirming that refusal to waive the Fifth Amendment privilege cannot lead “automatically and without more to imposition of sanctions”);
 
 Lefkowitz v. Turley,
 
 414
 
 *-1451
 
 U.S. 70, 94 S.Ct. 816, 38 L.Ed.2d 274 (1973) (loss of public contract);
 
 Uniformed Sanitation Men Ass’n v. Commissioner of Sanitation,
 
 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (loss of public employment);
 
 Gardner v. Broderick,
 
 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (loss of employment as police officer);
 
 Garrity v. New Jersey,
 
 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (loss of employment as police officer).
 

 There is, in any event, compelling evidence in the present case which the district court could readily rely upon to support the drawing of adverse inferences inimical to Edith’s claim of entitlement to Devil His Due. For example, given the labile nature of Edith’s financial circumstances, as evidenced by her claim of abject poverty in her judicial certification, the indiscriminate infusions and withdrawals of Robert’s borrowings into and out of Lion Crest’s account, his pervasive dominance over Lion Crest’s monies, and Edith’s insouciance in respect to her father’s appropriations of Lion Crest’s funds, Robert’s refusals to answer whether his money “went to purchase Devil His Due the first time that he was purchased by Lion Crest Stables,” as well as “the second time it was purchased by Lion Crest Stable,” would support a finding that Robert funded the acquisition and reacquisition of the horse.
 

 Even under the district court’s limited view of nominee liability, such a finding would remove the sticking point which the district court believed precluded it from finding Edith to be Robert’s nominee-owner of Devil His Due and from imposing a constructive trust: the absence of direct proof of a transfer of the horse from Robert to Edith. It is universally understood that “where a constructive trust has invested [wrongfully acquired] funds or has purchased other property [with wrongfully acquired funds], the [party for whose benefit a constructive trust has been imposed] can follow it wherever it can be traced.”
 
 Trustees of Clients’ Sec. Fund v. Yucht,
 
 243 N.J.Super. 97, 112, 578 A.2d 900, 909 (Ch. Div.1989) (citing Restatement of Restitution § 202 (1936)) (holding that beneficial interest of property wrongfully acquired remains in constructive trust for the wronged party);
 
 see also Meyner v. Burlington-Bristol Bridge Co.,
 
 29 N.J. 210, 219, 148 A.2d 585, 590 (1959) (party for whose benefit constructive trust was imposed had right to profits from constructive trust asset). “Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property.”
 
 D'Ippolito v. Castoro,
 
 51 N.J. 584, 589, 242 A.2d 617, 619 (1968). It is not necessary, therefore, to find that Devil His Due was transferred from Robert to Edith; it is sufficient for nominee and constructive trust purposes if it is found, with the aid of the requisite adverse inference, that Robert transferred his money to Edith for the purchase of Devil His Due, consistent with his obvious desire to secrete his assets. If so, a constructive trust may be deemed imposed upon such funds, which trust would accordingly follow the “beneficial interest” of ownership in the true asset.
 
 See Stewart v. Harris Structural Steel Co.,
 
 198 N.J.Super. 255, 265-66, 486 A.2d 1265, 1271 (App.Div. 1984) (“ “When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.’ ”) (quoting
 
 Beatty v. Guggenheim Exploration Co.,
 
 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919)).
 

 CONCLUSION
 

 Accordingly, we remand so that the district court may reconsider who is due Devil His Due.
 

 [1]
 

 . William Shakespeare, Richard III act 5, sc. 4.
 

 [2]
 

 . Both Edith and Robert are New Jersey residents, and the vast majority of the events relevant to this case occurred in New Jersey. (This suit was brought in the Northern District of New York only because the IRS levied upon Devil His Due when he was in Saratoga preparing for the Whitney Handicap.) The parties agreed, and the district court correctly concurred, that under the facts of this case the substantive law of New Jersey was applicable.
 
 See Pescatore v. Pan American World Airways, Inc.,
 
 97 F.3d 1, 5 (2d Cir. 1996) ("The normal federal disposition is for a federal court to apply the relevant state’s law as the federal rule of decision....”). By con
 
 *-1462
 
 trast, issues of evidence are, of course, the province of federal law.
 
 See
 
 Fed.R.Evid. 402;
 
 United States v. Jacobs,
 
 547 F.2d 772, 777 (2d Cir.1976) (inconsistent state evidence rules barred by catch-all clause of Rule 402).
 

 [3]
 

 . Rule 301 provides:
 

 [4]
 

 . While we made a fortuitous reference in a footnote in
 
 Brenner v. World Boxing Council,
 
 675 F.2d 445, 454 n. 7 (2d Cir.1982), that "since King was a non-party witness, no adverse inference against appellees could have been drawn from his refusal to testify,” the district court's reliance on this statement,
 
 LiButti,
 
 894 F.2d at 596, is misplaced in light of our rejection of any such bright-line rule in our subsequent decision in
 
 Brink's.