**In re RODOLITZ HOLDING CORP., Abraham J. Rodolitz and Anna Rodolitz, Debtors.**

**Abraham J. RODOLITZ, Plaintiff,**

v.

**BEL CANTO FANCY FOODS, LTD., Defendant.**

Nos. 893–80785–167, 893–80786–167. Adv.Pro.No. 895–8665–167.

United States Bankruptcy Court, E.D. New York.

March 11, 1997.

Schillinger & Finsterwald, by Peter Schillinger, New York City, for Bel Canto Fancy Foods, Ltd.

The Law Offices of Eugene L. Weisbein, P.C., by Eugene L. Weisbein, James W. Cooke, Garden City, NY, for Abraham L. Rodolitz.

## DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

JOHN J. CONNELLY, Bankruptcy Judge.

Plaintiff–Debtor Abraham J. Rodolitz ("Plaintiff" or "Rodolitz") has commenced this adversary proceeding[1] against defendant Bel Canto Fancy Foods, Ltd. ("Defendant" or "Bel Canto"), seeking to recover over $3 million in damages due to Bel Canto's alleged breach and default under a contract for the purchase of certain property. Rodolitz has also moved this Court to abstain from hearing this adversary proceeding pursuant to 28 U.S.C. § 1334(c)(1) and remand a related New York Supreme Court action pursuant to 28 U.S.C. § 1452(b). The Court, at a hearing held on March 1, 1996, denied the request for remand and heard oral argument of counsel as to the remaining issues.

Bel Canto alleges that Rodolitz, as seller, breached the contract at issue by failing to provide "marketable title" to the property on the agreed-upon closing date and cross-moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Bankruptcy Rule 7012(b)(6). Having received affidavits and

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to the Court under Rule 4 of the General Rules of the United States District Court for the Eastern District of New York. This is a core matter under 28 U.S.C. § 157(b)(2)(A).

submissions from both parties that went beyond the scope of the pleadings, at the hearing on March 1, 1996, the Court advised the parties that it would treat Bel Canto's motion under Bankruptcy Rule 7012(b) as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). Accordingly, the parties were given the opportunity to file the required Local Rule 22(b) statements and post-trial briefs in support and opposition to the converted motion.

*BACKGROUND*

Rodolitz was at all relevant times the sole owner of water front real property located at 47–25 27th Street, Long Island City, New York (the "Property"). On or about May 11, 1995, Rodolitz, as seller, and Bel Canto, as purchaser, entered into a contract of sale for the Property (the "Contract," a copy of which is annexed to the Notice of Cross Motion as Exhibit B). The Contract provided that the Property was to be sold by Rodolitz to Bel Canto for the sum of $2.3 million and that a closing was to take place "on or about June 30, 1995 but in no event later than 10:00 a.m. on August 15, 1995, it being the intention of both Purchaser and Seller that time is of the essence with respect to the August 15, 1995 date." (Contract at ¶ 7). Bel Canto initially made a down payment under the Contract in the sum of $125,000.

The Contract provides, *inter alia*, that: (i) Seller is required to convey the Property in such condition that the buildings and improvements thereon do not violate laws and governmental regulations (Contract at ¶ 4); and (ii) the "Premises are sold and shall be conveyed and taken subject to ... [a]ny state of facts an accurate survey would reveal, provided same do not render title unmarketable" (Contract at ¶ 25).[2]

Additionally, the Seller is required to deliver insurable title (Contract at ¶ 5), specifically:

SELLER shall give and PURCHASER shall accept such title as any reputable New York title company, a member of the New York Board of Title Underwriters, will be willing to approve and insure in accordance with their standard form of title policy, subject only to the matters provided for in this contract.

At Bel Canto's request, Continental Abstract Corp. on behalf of Ticor Title Guarantee Company ("Ticor Title"), issued a title report dated March 9, 1995 (the "Title Report"). At paragraphs 1 through 6, the Title Report sets forth matters that the Title Company will not insure. Pursuant to paragraph numbered 3 of the Title Report, the Title Company will not issue title insurance coverage for:

[a]ny laws, regulations or ordinances (including, but not limited to zoning, building, and environmental protection) as to the use, occupancy, subdivision or improvement of the premises, adopted or imposed by any governmental body, **or the effect of any noncompliance with or any violation thereof.** (emphasis added)

Schedule "B" of the Title Report sets forth specific exceptions to title insurance coverage. By letter dated May 31, 1995, the Title Company issued an amended list of title exceptions (the "Amended Schedule B") which, *inter alia*, amends paragraph numbered 12 of the Title Report. Paragraph numbered 12(c) of the Amended Schedule B subjects title insurance coverage "to the rights of the public to navigate the waters of Dutch Kills Basin."

In further preparation for the closing, Bel Canto had a survey prepared by Kulhanek & Plan Land Surveyors P.C., dated July 17, 1995 (the "Survey"). The Survey shows that the Property's east bulkhead is approximately two hundred sixty eight feet in length and encroaches upon the federal bulkhead line by seven feet, one-half inches. It is this bulkhead that is at the heart of the dispute.

Subsequently, Bel Canto learned that during 1988, Rodolitz replaced the original bulk-

---

**2.** Additional pertinent provisions of the Contract provide, *inter alia* as follows: (i) the Purchaser has inspected the Property and is purchasing the Property "as is" with no representations having been made by the Seller as to the physical condition or any other matter or thing affecting or related to the Property or its contents (Contract at ¶ 32a); and (ii) the Purchaser acknowledges that it had caused the Property to be inspected by a professional engineer hired by the Purchaser (Contract at ¶ 39).

head with a new steel sheet piled bulkhead. Bel Canto claims the existing steel bulkhead is in violation of law because it extends, at one point, approximately seven feet further into the Dutch Kills Basin than the previously existing similar structure, in an area adjacent to a federal navigation project. Rodolitz denies this assertion and states that the easterly wall of a building on the Property is located approximately 10 feet west of the Property line and the bulkhead is located approximately 15 feet east of the easterly wall.

By letter dated August 22, 1995, the City of New York stated that the City had not issued a letter of completion concerning Rodolitz's reconstruction of the bulkhead under the application. Furthermore, the City's letter went on to state that a letter of completion would not be issued ". . . until this Department receives documentation of approval of the Bulkhead from the United States Army Corps of Engineers and The New York State Department of Environmental Conservation." The record reflects that Rodolitz reconstructed the bulkhead without obtaining the required federal, state or municipal government approvals and never obtained the required approval from the U.S. Army Corps of Engineers ("Army Corps") or the New York State Department of Environmental Conservation ("DEC") on or before the August 15, 1995 contractual time-of-the-essence closing date. However, Rodolitz contends that the violations resulting from his failure to obtain prior approval from the federal, state and municipal governments were vitiated by his obtaining a work permit in the form of a work permit/notice issued by the City of New York's Department of Ports and Trade, to proceed with the bulkhead reconstruction prior to the time that said reconstruction was commenced. With respect to the DEC and the Army Corps, Rodolitz contends that he applied for, and eventually received, after-the-fact authorization for the bulkhead from the Army Corps, however this was not obtained on or before the August 15, 1995 contractual time-of-the-essence closing date.

It is undisputed that the reconstructed steel bulkhead is not located within the metes and bounds description of the Property to be conveyed pursuant to the Contract. *See* Schedule A of Contract.

Rodolitz denies that the encroachment of the federal bulkhead line by the bulkhead constitutes a default of the Contract. However, pursuant to paragraph numbered 5 of the Contract, Rodolitz is required to deliver insurable title. As a result of the bulkhead being in violation of federal, state and local law by its encroachment upon the federal bulkhead line, Ticor Title refused to insure as the title was rendered uninsurable, pursuant to paragraph numbered 3 of the Title Report, as set forth above. Additionally, by its Amended Schedule B, also set forth above, Ticor Title declined to insure for the violations caused by the bulkhead encroachment where it issued an exception for ". . . the rights of the public to navigate the waters of Dutch Kills Basin."

By letter dated July 31, 1995, Bel Canto's counsel advised Rodolitz and Rodolitz's counsel that because title to the Property was neither marketable nor insurable and was incurably defective due to, *inter alia,* the bulkhead encroachment as shown by the aforedescribed Survey, Bel Canto was canceling the Contract. In addition to canceling the Contract, the letter also demanded the return of the down payment and incidental expenses. Bel Canto argues that by this letter, it complied with the provisions of paragraph numbered 30 of the Contract which states:

> Purchaser, at least fourteen (14) days prior to closing of title hereunder, shall furnish to Seller's attorney a written notice of exception to title.

In response, pursuant to letters dated August 3 and August 10, 1995, Rodolitz's counsel advised Bel Canto's counsel that Rodolitz was ready, willing and able to convey title to the Property to Bel Canto on the scheduled closing date. On August 15, 1995, Rodolitz, his attorney and a representative from Intracoastal Abstract Co., Inc., a New York title company ("Intracoastal"), were present in Rodolitz's attorneys' office for purposes of tendering the deed to the Property to Bel Canto. Bel Canto did not appear at the closing. The Contract did not close on Au-

gust 15, 1995, the time of the essence closing date.

Bel Canto asserts that it rightfully cancelled the Contract because Ticor Title refused to insure for violations of laws involving any governmental entity. Rodolitz claims that this is irrelevant because on the day set for the closing, Rodolitz had in attendance at the closing a reputable New York title company, Intracoastal, as required by the Contract, prepared to insure title to Bel Canto.

By letter dated August 24, 1995, from Mr. Christopher S. Mallery, Chief of the Harbor Supervision and Compliance Section of the Army Corps, to Mr. Raphael H. Courland, an engineer hired by Bel Canto, the Army Corps advised that it "has determined that the scope of the violation does not warrant any further enforcement action at this time." The letter also states that "[i]n the event that the removal or reconfiguration of the bulkhead is found to be necessary through the public interest review process, those responsible for the property at that time would bear the cost of such modification."

*DISCUSSION*

Pursuant to Fed.R.Civ.P. 56(c), made applicable to these motions by Fed.R.Bankr.P. 7056, summary judgment can be granted only where there are no genuine issues of material fact. Summary judgment must be denied where the facts in dispute will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to clearly establish the absence of a genuine issue as to any material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Western World Insurance Co. v. Stack Oil*, 922 F.2d 118 (2d Cir.1990).

I. Pursuant to the clear and unambiguous terms of the Contract, *Bel Canto properly exercised its right to terminate the Contract*

■ Rodolitz contends that the buyer never really cared about the encumbrance and is just using the bulkhead issue as a red herring to escape from a binding contract. However, the Contract specifically states that either party could release themselves from the deal with 14 days notice (before the closing), and does not say anything about reasons for such a release. (Contract at ¶ 30). Plainly put, Bel Canto exercised that option and got the specified benefit. Why they exercised the option was not something that was to be an issue according to the clear and unambiguous terms of the original Contract, so this issue is readily dismissed here. *See Foley Productions, Inc. v. Singer Corp.*, 133 A.D.2d 531, 519 N.Y.S.2d 902 (4th Dept. 1987).

■ One of the parties to a contract may terminate it if the contract so provides, as here, where an option to rescind is given to one or both of the parties, and an exercise of such an option is not an act of bad faith. Thus the termination, in accordance with the terms of the Contract which was terminable at will, on a specific number of days' notice, does not constitute a breach of the agreement. *Id.* Bel Canto's motivation for the rejection of title is immaterial, as is the question of whether or not the exception rendered title unmarketable. *Weintraub v. Rungmar Realty Corp.*, 231 N.Y.S.2d 241 (Sup.Ct.West.Cty.1962). Under the circumstances, Bel Canto is even more justified in refusing to take a title which Ticor Title refused to approve and insure unqualifiedly and without exceptions, and which may subject Bel Canto to litigation in the future because of said violation. The record is clear that Bel Canto gave Rodolitz the required 14 day written notice of its decision to cancel the Contract. Thus, Bel Canto properly complied with the provisions of the Contract with respect to termination of same. Coupled with the fact that the encumbrance is real, even if the Court finds that Rodolitz's

position is correct, which it does not, Rodolitz's claim here is meritless.

## II. The title is rendered unmarketable *because of the violations of federal law*

■ At the heart of this dispute is whether or not Rodolitz was able to convey insurable and marketable title to the Property to Bel Canto on August 15, 1995, the time-of-the-essence closing date. According to the terms of the Contract, the Property has to be delivered in full compliance with all laws, including federal. (Contract at ¶¶ 4a and 11a). When a contract specifies that a property is to be conveyed free and clear of any encumbrances or violations of law and the property is not thus conveyed, then the purchaser need not accept title and is entitled to recover the down payment. *Pamerqua Realty Corp. v. Dollar Service Corp.*, 93 A.D.2d 249, 461 N.Y.S.2d 393 (2d Dept.1983); *see Rhodes v. Astro–Pac, Inc.*, 41 N.Y.2d 919, 394 N.Y.S.2d 623, 363 N.E.2d 347 (1977); *Sora v. Kelly*, 8 Misc.2d 466, 168 N.Y.S.2d 94 (Sup.Ct. Queens Cty.1957).

■ Rodolitz contends that the Property is free of any encumbrances of law. This assertion is based on two claims. First, that the property being conveyed is not the same as the property that is encumbered. Specifically, because the bulkhead is not being conveyed in the title, its existence cannot possibly render title to the rest of the Property unmarketable. However, according to letters written by the Army Corps and submitted into evidence at the hearing by Rodolitz himself, if the bulkhead should ever require removal, the party owning the adjacent property would be responsible for the cost of the removal. (*See* August 24, 1995 letter). Thus, the property is in fact burdened by the existence of the bulkhead. That it is not involved in the transfer is irrelevant. According to *Dukas v. Tolmach*, 2 A.D.2d 57, 153 N.Y.S.2d 392, 395 (1st Dept.1956), even if the encumbrance is not part of the transfer it must still be considered in the question of marketability of the title.

The second claim is that there is little chance that the encumbrance will ever have to be removed. Rodolitz cites *Regan v. Lanze*, 40 N.Y.2d 475, 387 N.Y.S.2d 79, 354 N.E.2d 818 (1976) to support this contention. While the *Regan* court stated that "the law assures to a buyer a title free from doubt, but not every doubt ... and the mere possibility or suspicion of a defect, which according to ordinary experience has no probable basis does not demonstrate an unmarketable title" (*Id.*, 387 N.Y.S.2d at 83, 354 N.E.2d 818), in the instant case, the defect does in fact have a probable basis. The letter dated August 24, 1995 from the Army Corps states specifically that if situations relating to the navigability of the waters that the bulkhead lies in should ever change so as to require removal of the bulkhead, then it will have to be removed. Based upon the record, there exists a violation of law at this time. It is just that the state has never done anything to enforce it, although the Court does not view this as simply a remote possibility. (*See* Affidavit of Stewart O'Brien dated February —— (undated) ——, 1996). Furthermore, the court in *Dukas, supra*, specifically says that "nor can it be said that the title is marketable because the city has not, and may not in the immediate future demand the removal of the encroachments." *Dukas*, 153 N.Y.S.2d at 395. Such is the case here.

Rodolitz's final contention is that the City of New York work permit that allowed him to construct the bulkhead serves as proof that there is no violation of law here. However, the bulkhead was never constructed in compliance with the work permit, which specified that the new bulkhead be constructed along the same lines as the old one. In fact, the old bulkhead was straight whereas the new one is semicircular in shape, hence the encroachment. Furthermore, the work permit specifically states that approval by the City is contingent upon approval by the Army Corps, something that was never obtained on or before the August 15, 1995 contractual time-of-the-essence closing date. Any after-the-fact-authorization for the bulkhead only serves to buttress the fact that Rodolitz was not able to deliver marketable title on August 15, 1995. Therefore, the work permit is not at all instructive to the Court, except to further support that Rodolitz failed to provide "marketable title," there-

by entitling Bel Canto to the return of its security deposit.

*CONCLUSION*

Under the clear and unambiguous terms of the Contract, either party could release themselves from the deal with 14 days notice prior to the closing date without disclosing any reasons for such a release. On July 31, 1995, Bel Canto properly exercised that option pursuant to the Contract. Consequently, Rodolitz's contention that Bel Canto breached and defaulted under the Contract rings hollow.

Finally, even if Bel Canto had not properly exercised this option to release itself from the Contract, under the circumstances of this case, Bel Canto was justified in refusing to take a title which its title company will not approve and insure unqualifiedly and without exceptions, and which may subject them to litigation in the future because of the violation created by the existing bulkhead. Accordingly, since Rodolitz has failed to establish the existence of any material issue of fact requiring trial, Rodolitz's motion for summary judgment is denied, Bel Canto's motion for summary judgment is granted and the complaint will be dismissed. Bel Canto will have judgment for the $125,000 down payment given under the Contract.

Counsel for Bel Canto is directed to settle an order consistent with this Decision within ten (10) days.