**In re RODOLITZ HOLDING CORP., Abraham J. Rodolitz and Anna Rodolitz, Debtors.**

**Anna Rodolitz, as Executrix of the Estate of Abraham Rodolitz, Plaintiff–Appellant,**

v.

**Bel Canto Fancy Foods, Ltd., Defendant–Appellee.**

**No. CV 97–4367(ADS).**

United States District Court, E.D. New York.

March 23, 1999.

Kenneth B. Schwartz, Garden City, New York, for the plaintiff-appellant Anna Rodolitz, Executrix of the Estate of Abraham Rodolitz.

Schillinger & Finsterwald, New York City, by Peter Schillinger, of counsel, for the appellee-defendant Bel Canto Fancy Foods, Ltd.

*MEMORANDUM OF DECISION*
*AND ORDER*

SPATT, District Judge.

On October 24, 1995, the now-deceased Debtor, Abraham J. Rodolitz (the "Debtor" or "Rodolitz") commenced an adversary proceeding in Bankruptcy Court against the defendant-appellee, Bel Canto Fancy Foods, Ltd. (the "appellee" or "Bel Canto"), seeking to recover more than $3 million in damages. The adversary proceeding arose from Bel Canto's alleged breach and default under a contract for the purchase of certain real estate (the "Property"). The executrix of the Estate of Abraham Rodolitz (the "Appellant") appeals from a decision of the Bankruptcy Court (John J. Connelly, U.S.B.J.), dated March 11, 1997, concluding that Bel Canto was entitled to summary judgment dismissing the complaint because: (1) pursuant to the clear and unambiguous terms of the contract, Bel Canto properly exercised its right to terminate the contract; and (2) Rodolitz was unable to convey insurable and marketable title to the Property to Bel Canto on August 15, 1995, the time-of-the-essence closing date. *See In re Rodolitz Holding Corp.*, 206 B.R. 657 (Bankr. E.D.N.Y.1997) (Connelly, J.). With regard to the "time-is-of-the-essence" clause, the contract provided, in relevant part, as follows:

> Closing will take place at . . . 10 a.m. on or about June 30, 1995 but in no event later than 10 a.m. on August 15, 1995, it being the intention of both Purchaser and Seller that time is of the essence with respect to the August 15, 1995 date.

(Contract, at ¶ 7).

On appeal, the parties apparently agree that the bankruptcy court's first line of reasoning—namely, that the contract granted either side an unrestricted right to cancel or 14 days notice—was due to a "misinterpretation" (Appellee's Mem. of Law, at 34 n. 6) of paragraph 30 of the Contract. Regardless, this Court affirms for substantially the remaining reasons set forth in the bankruptcy court's detailed, thoughtful, and thorough opinion.

## I. BACKGROUND

The background to this case is set forth in Judge Connelly's opinion, full familiarity with which is presumed and need not be repeated.

## II. DISCUSSION

### A. Summary Judgment: The Standard

On appeal, the Court must review the Bankruptcy Court's grant of summary judgment de novo. *In re Stelluti*, 94 F.3d 84, 87 (2d Cir.1996). Rule 56 of the Federal Rules of Civil Procedure governs the grant or denial of summary judgment in an adversary proceeding in Bankruptcy Court. *See* Fed.R.Bank.P. 7056. Rule 56(c) provides that summary judgment shall be entered where the movant demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also In re Blackwood Associates, L.P.*, 153 F.3d 61, 67 (2d Cir.1998) (citing Fed.R.Civ.P. 56[c]; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 [1986], *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 [1986] ). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (citing *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 [2d Cir.1988] ). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). The trial court's task is "carefully limited to discerning whether there are any genuine issues of material

fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996) (quoting *Gallo v. Prudential Residential Servs., Ltd., Partnership,* 22 F.3d 1219, 1224 [2d Cir. 1994] ), *cert. denied sub nom., Zollo Drum Co., Inc. v. B.F. Goodrich Co.,* — U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998).

Rodolitz attributes error to various aspects of Judge Connelly's decision, which are addressed, in turn, below.

## B. Rodolitz Was Unable to Deliver Marketable Title

First, Rodolitz contends that the Bankruptcy Court erred in holding as a matter of law that violations of federal law rendered title unmarketable.

The violations stem from a steel bulkhead on the Property which encroaches by more than seven feet upon the United States Bulkead Line into the Dutch Kills basin, waterway which joins the East River. The seven-foot bulkhead encroachment in this case is undisputed. As the Bankruptcy Court observed, "the record reflects that Rodolitz reconstructed the bulkhead without obtaining the required federal, state or municipal government approvals and never obtained the required approval from the U.S. Army Corps of Engineers ("Army Corps") or the New York State Department of Environmental Conservation ("DEC") on or before the August 15, 1995 contractual time-of-the-essence closing date." Nevertheless, Rodolitz maintains that violations of federal law do not affect the marketability of title, since marketability is concerned only with "impairments on title rather than public regulations." (Appellant's Mem. of Law, at 16). At issue is whether the violation of federal law rendered the title unmarketable.

The parties agree that Rodolitz was obligated to deliver marketable title to Bel Canto. Specifically, paragraph 25 of the Contract provides, in pertinent part, that:

25. Said premises are sold and shall be conveyed and taken subject to the following:

(a) Any state of facts an accurate survey would reveal, provided same do not render title unmarketable....

■ However, it was not necessary for the contract to specify that a marketable title was required. There is no stipulation to the contrary, and it is presumed that a marketable title is be conveyed. *See Voorheesville Rod & Gun Club v. E.W. Tompkins Co.,* 82 N.Y.2d 564, 571, 606 N.Y.S.2d 132, 626 N.E.2d 917 (1993) (citations omitted).

■ "The test of the marketability of a title is 'whether there is an objection thereto such as would interfere with a sale or with the market value of the property.' " *Id.* at 571, 606 N.Y.S.2d 132, 626 N.E.2d 917 (quoting *Regan v. Lanze,* 40 N.Y.2d 475, 387 N.Y.S.2d 79, 354 N.E.2d 818 [1976] ). "A marketable title is 'a title free from reasonable doubt, but not from every doubt.' " *Id.* (quoting same). The New York Court of Appeals explained in *Voorheesville* that a " 'purchaser ought not to be compelled to take property, the possession or title of which he may be obliged to defend by litigation. He should have a title that will enable him to hold his land free from probable claim by another, and one which, if he wishes to sell, would be reasonably free from any doubt which would interfere with its market value.' " (quoting *Dyker Meadow Land & Improvement Co. v. Cook,* 159 N.Y. 6, 15, 53 N.E. 690 [1899] ).

■ The Court agrees with the Bankruptcy Court's conclusion that the title to the Property was rendered unmarketable because of the violations of federal law arising from the encroachment of the United States Bulkhead Line, which could subject Bel Canto to litigation, enforcement proceedings and construction costs. In letters written by the Army Corps and

submitted into evidence at the hearing before the Bankruptcy Court by Rodolitz, the "structure does constitute a violation of the statutes and regulations within the jurisdiction of this office [ ]particularly, the provisions of the Rivers and Harbors Act of 1899[33 U.S.C. § 403,] ... of the Clean Water Act [33 U.S.C. § 1344,] ... and of the regulations promulgated pursuant thereto...." While those same letters indicated that the "scope of the violation does not warrant any further enforcement action at this time," the Army Corps also indicated that "In the event that the removal or reconfiguration of the bulkhead is found to be necessary through the public interest review process, those responsible for the property at that time would bear the costs of such modification."

Nevertheless, Rodolitz insists that the seven-foot encroachment did not affect marketability because violations of law do not affect marketability of title; no violation of record was shown; and the issues as to marketability of title raised genuine questions of material fact which precluded summary judgment. This Court disagrees.

There was no dispute as to the encroachment itself. There also was no dispute that, on the time-is-of-the-essence date, the encroachment was in violation of federal law. Where, as here, "the encroachment is such as to create a reasonable doubt as to the marketability of the title, or it is apt to result in litigation to determine the question, then the title generally is regarded as defective, the likelihood of litigation in effect constituting an encumbrance." 91 N.Y.Jur.2d Real Prop. Sale § 104 (1991) (Current through November 1998). "A title otherwise unmarketable because of the encroachment on [government property] is not rendered marketable merely because the [government] has not, and may not in the immediate future, demand that such encroachments be removed...." 91 N.Y.Jur.2d Real Prop. Sale § 105 (1991) (Current through November 1998).

To illustrate, in *Ossining Associates v. City of New York*, 6 A.D.2d 621, 623, 180 N.Y.S.2d 43, 45 (1st Dept 1958), *affirmed*, 7 N.Y.2d 865, 196 N.Y.S.2d 997, 164 N.E.2d 868 (1959), the First Department observed that, "[In our opinion the bay window encroachment of six feet rendered the title unmarketable. The City *could subsequently* have compelled the removal thereof [under the] Administrative Code of the City of New York]." Similarly, in *Dukas v. Tolmach*, 2 A.D.2d 57, 58, 153 N.Y.S.2d 392, 394 (1st Dept.1956), the Second Department stated that "The question posed therefore is whether under these facts[,] the so-called encroachments being clearly established by the evidence[,] defendants' title is marketable. We think it is not. A purchaser may not be compelled to accept a title which will subject him to a lawsuit or which will require him to expend substantial sums of money in order to comply with the law." Such was the case here at the time of the firm closing date.

Rodolitz makes much of the fact that he applied for, and eventually received, after-the-fact authorization for the bulkhead from the Army Corps. However, this was not obtained on or before the August 15, 1995 contractual time-of-the-essence closing date. The bankruptcy court "correctly held that [the] seller, who [agreed to the creation of a law day by consenting to a] 'time of the essence' [clause in the Contract,] was required to tender performance of his obligations *on law day* (*Grace v. Nappa*, 46 N.Y.2d 560, 565, 415 N.Y.S.2d 793, 389 N.E.2d 107), *including that the premises be transferred free and clear of all violations of law* .... Since at closing defendant admittedly did not have the [authorization for the bulkhead from the Army Corps, the] buyer could declare [Rodolitz] in default and demand return of the contract deposit." *Dub v. 47 East 74th Street Corp.*, 204 A.D.2d 145, 611 N.Y.S.2d 198, (1st Dept.) (emphasis added), *leave denied*, 84 N.Y.2d 850, 617 N.Y.S.2d 139, 641 N.E.2d 160 (1994).

■ The Court also is not persuaded by Rodolitz's theory that given Bel Canto's "failure to appear at the time of the essence closing, on August 15, 1995 and tender all consideration due, Respondent waived any right to enforcement on that particular date. Appellant was under no obligation to cure until a reasonable time after August 15, 1995—not on August 15, 1997 time of the essence." (Appellant's Mem. of Law, at 29). While ordinarily the law will allow a seller and buyer a reasonable time to perform their respective obligations, regardless of whether they specify a particular date for the closing of title, where there is a declaration that time is of the essence, "each party must tender performance on law day unless the time for performance is extended by mutual agreement." *Grace v. Nappa*, 46 N.Y.2d 560, 565, 415 N.Y.S.2d 793, 796, 389 N.E.2d 107 (1979) (citations omitted).

■ Here, there was no such "mutual agreement." In fact, by letter dated July 31, 1995, approximately two weeks before the time of the essence closing date of August 15, 1995, Bel Canto's counsel advised Rodolitz and Rodolitz's counsel that Bel Canto was canceling the Contract because the title to the Property was neither marketable nor insurable and was incurably defective due to the bulkhead encroachment. In the Court's opinion, this was not a waiver of the time of the essence date but, rather, an express enforcement of it. Also, in the Court's view, since the defect was not reasonably curable on or before the closing date, Bel Canto was not required to undertake the futile act of appearing at the closing to reject the seller's unmarketable title.

## C. Rodolitz Was Unable to Deliver Insurable Title

The record indicates that Rodolitz failed to tender insurable title.

Under the terms of the sales contract, Rodolitz was required to deliver insurable title. Specifically, the Contract stated at paragraph 5:

SELLER shall give and PURCHASER shall accept such title as any reputable New York title company, a member of the New York Board of Title Underwriters, will be willing to approve and insure in accordance with their standard form of title policy, subject only to the matters provided for in this contract.

At Bel Canto's request, Continental Abstract Corp. on behalf of Ticor Title Guarantee Company ("Ticor Title"), issued a title report dated March 9, 1995 (the "Title Report"). At paragraphs 1 through 6, the Title Report sets forth matters that the Title Company will not insure. Pursuant to paragraph numbered 3 of the Title Report, the Title Company will not issue title insurance coverage for:

[a]ny laws, regulations or ordinances (including, but not limited to zoning, building, and environmental protection) as to the use, occupancy, subdivision or improvement of the premises, adopted or imposed by any governmental body, or the effect of any noncompliance with or any violation thereof.

Schedule "B" of the Title Report sets forth specific exceptions to the title insurance coverage. By letter dated May 31, 1995, the Title Company issued an amended list of title exceptions (the "Amended Schedule B") which, among other things, amends paragraph number 12 of the Title Report. Paragraph numbered 12(c) of the Amended Schedule B subjects title insurance coverage "to the rights of the public to navigate the waters of Dutch Kills Basin."

■ Thus, under the terms of the contract, Rodolitz was required to tender title such as any reputable title company would approve and insure, subject to the exceptions noted in the contract. "[W]hen a seller so contracts, [there is a] breach[ of the] contract when the title company refuses to insure title unconditionally and without exception. This is, of course, the usual construction given to clauses of this nature." *Laba v. Carey*, 29 N.Y.2d 302,

307, 327 N.Y.S.2d 613, 617, 277 N.E.2d 641 (1971). Here, Bel Canto's title insurance company was unwilling to provide insurance unconditionally and without an exception. Thus, Rodolitz "failed to fulfill the obligation to furnish insurable title in accordance with the contract terms." *See Patten of New York Corp. v. Geoffrion,* 193 A.D.2d 1007, 1009, 598 N.Y.S.2d 355, 357 (3d Dept.1993).

The Court has reviewed Rodolitz's remaining arguments and finds them without merit.

## III. CONCLUSION

Having reviewed the parties' submissions, and for the reasons set forth above, it is hereby

**ORDERED,** that the decision of the bankruptcy court is affirmed; and

**ORDERED,** the Clerk of the Court is directed to close the case.

**SO ORDERED.**