In re Paul MAGHAZEH, Debtor.

Marc A. Pergament, Trustee of the Estate of Paul Maghazeh, Plaintiff,

v.

Maghazeh Family Trust, Bay Ridge Savings and Loan Association, JPMorgan Chase Bank f/k/a Chemical Bank, H.F. Investors, Inc., Joan R. Addrizzo, M.D., Chitoor Govendarraj, M.D., P.C. Retirement Trust, United States of America, Hamilton Federal Savings and Loan Association, Danmar Management Limited Partnership, Copelco Leasing Corp., General Electric Company, Eaton Financial Corporation, Zimmer, Victor & Bernstein, Nirmala Batheja, the Bank of New York, New York State Department of Taxation and Finance, Cobble Resources, Inc., Defendants.

Bankruptcy No. 01–87924–478.
Adversary No. 802–8181–478.

United States Bankruptcy Court, E.D. New York.

May 6, 2004.

Marc A. Pergament, Garden City, NY, Chapter 7 Trustee.

Larry I. Glick, Garden City, NY, for Defendant.

Bernstein & Schwartz LLP, by Jeffrey Schwartz, New York City, for Cobble Resources, Inc.

Law Offices of Charles Stiene, Mineola, NY, for JP Morgan Chase Bank.

Weinberg Kaley Gross & Pergament, Garden City, NY, for Chapter 7 Trustee.

U.S. Department of Justice, by Bartholomew Cirenza, Bonni J. Perlin, Washington, DC, for United States of America.

Office of the United States Trustee, by Terese Cavanagh, Central Islip, NY, for Eastern District of New York.

Steinberg, Fineo, Berger & Fischoff, PC, by Gary Fischoff, Woodbury, NY, for Debtor.

## DECISION ON MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

DOROTHY EISENBERG, Bankruptcy Judge.

The Chapter 7 trustee (the "Trustee") has moved under Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure for an order and judgment declaring, *inter alia*, that a trust set up by the Debtor for the benefit of his two children (the "Maghazeh Trust") is entitled to the remaining net proceeds from the sale of real property owned by the Debtor in Brooklyn, New York, and that the Maghazeh Trust is entitled to a portion of the remaining net proceeds from the sale of real property owned by the Debtor in Cutchogue, New York (the "Motion"). The United States, which has federal tax liens on the property located in Brooklyn,

and which has claims against the Cutchogue property, cross-moves for summary judgment for an order declaring that the Maghazeh Trust is the alter ego of the Debtor and consequently the Maghazeh Trust's claim in this case has no value by reason of the doctrine of merger and/or because the collateral mortgages on which they are based have been released to the Debtor (the "Cross–Motion"). In the alternative, the United States opposes entry of summary judgment in favor of the Trustee on the grounds that there are genuine issues of material fact with respect to the Trustee's motion, including whether the Maghazeh Trust's claim in this case has been satisfied.

Based on the papers filed with the Court and the relevant case law, the Court denies the Trustee's Motion and grants the United States' Cross–Motion to the extent that the Court finds that the Maghazeh Trust is the alter ego of the Debtor. Based on this finding, the mortgages held by the Maghazeh Trust are deemed to be part of the Debtor's estate without any ownership interest on behalf of the Maghazeh Trust. There are sufficient funds from the sale of both properties which belong to the Debtor's estate to satisfy all of the claims of the remaining creditors, including the United States.[1] The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr.P. 7052.

### BACKGROUND AND FACTS

1. *The Debtor and his Family Relationships.*

The Debtor is a physician. The Debtor and Joan Maghazeh were married. Paul Maghazeh, Jr. and Lisa Maghazeh are the

---

1. The total lien and general unsecured prepetition claim of the Internal Revenue Service ("IRS") is $1,614,580. All other prepetition claims total approximately $90,000. The IRS also has an administration claim for $42,485 as of March 15, 2002. Thus claims, not including compensation applications, total about $2.1 million against $3.1 million in assets if the Maghazeh Trust is the Debtor's alter ego, as alleged by the IRS.

Debtor and Joan Maghazeh's son and daughter. Paul Maghazeh, Jr., as of the date of the depositions, was approximately 40 years old. Lisa Maghazeh was approximately 43 years old. Joan Maghazeh died on August 12, 1991. On October 30, 1992, the Debtor, as grantor, Paul Maghazeh, Jr., as trustee, and Lisa Maghazeh, as trustee, executed a trust agreement titled "Maghazeh Family Irrevocable Trust," (the "Maghazeh Trust") effective as of September 17, 1992. (United States Ex. 1).[2] The beneficiaries of the Maghazeh Trust are Paul Maghazeh, Jr., and Lisa Maghazeh. The Debtor has no reversionary interest in the irrevocable Maghazeh Trust.

Although there are two trustees of the Maghazeh Trust, either trustee has the authority to act on behalf of and bind the Maghazeh Trust with the consent of the other trustee, which consent need not be in writing. Pursuant to the terms of the Maghazeh Trust, the trustees have the power and discretion to, among other things, borrow funds from any other person, invest in any property, whether real or personal, and extend the time for payment, litigate or settle any debt or obligation. (United States Ex. 1). At various times, the Maghazeh Trust maintained bank accounts at JPMorgan Chase and Citibank, N.A. (Maghazeh Trust Ex. 1).

Upon the formation of the Maghazeh Trust, the Maghazeh Trust became the owner of a Metropolitan Life insurance policy insuring the Debtor's life in the amount of $1 million. (United States Ex. 2). The premium payments were either paid directly by the Debtor, or the Debtor made deposits into the Maghazeh Trust's bank account to cover the premium payments due under the life insurance policy. (United States Ex. 36). This life insurance policy lapsed within one or two years as

the Debtor stopped funding the premium payments. In 1996, the Maghazeh Trust owned a New England Life term life insurance policy insuring the Debtor's life. (United States Ex. 3). This life insurance policy lapsed after approximately one year. As with the Metropolitan Life insurance policy, the premiums were paid with either the Debtor's funds or from funds deposited by the Debtor into the Maghazeh Trust's bank account. (United States Ex. 36). The only premiums paid for either policy came from the Debtor's funds. Until February 25, 1997, the Maghazeh Trust owned no other assets.

The Debtor and his two children, Lisa Maghazeh and Paul Maghazeh, Jr., lived together in the Debtor's Brooklyn residence, and continue to live together. From about 1988 until the present Lisa Maghazeh has lived with her father and has not earned any income. From about 1989 until the present, Paul Maghazeh, Jr. has lived with his father. Paul Maghazeh, Jr. worked for approximately one year for Empire State Diagnostic Laboratories, Inc. ("Empire") between 1989 and 1990, for which he was paid "very little." (United States Ex. 39, p. 74). Empire was a corporation in which his father had a substantial interest. Paul Maghazeh, Jr. also worked for approximately one year for his father's medical practice between 1996 and 1997, for which he was paid approximately $25,000. (United States Ex. 39, p. 74). Paul Maghazeh, Jr. has been working as a broker of ferrous and nonferrous metals, between mid—2002 to the present. (United States Ex. 39, p. 75).

The Debtor's records and the records for the Maghazeh Trust are both located at the Debtor's current residence, and counsel for the Maghazeh Trust has stated that the Debtor's personal records are

2. At this time, the Trustees were young adults.

commingled with the records of the Maghazeh Trust. (United States Ex. 36, p. 26, 27).

### 2. *The Debtor's Business Relations with A. Hassan Mohaideen and Jyoti Pirlamarla.*

The Debtor, A. Hassan Mohaideen and Jyoti Pirlamarla, were all doctors who entered into a business venture together. The doctors agreed to purchase a building in which to operate a laboratory facility and a radiological facility to treat their patients. The parties formed three entities. The Debtor and A. Hassan Mohaideen were each 42.5% shareholders in Empire, a diagnostic laboratory, and Jyoti Pirlamarla owned the remaining shares. Empire's laboratory was situated in the commercial building located at 348–356 13th Street, Brooklyn, New York (the "Mapmot Building"). The Debtor and A. Hassan Mohaideen were each 42.5% partners in Mapmot Realty Associates ("Mapmot"), together with Jyoti Pirlamarla, who was a 15% partner.

### 3. *Facts related to Mortgage 1 and Collateral Mortgage 1.*

On August 30, 1988, Mapmot purchased the Mapmot Building from Jun Saung Corporation. H.F. Investors Inc. acquired a mortgage on the Mapmot Building given by Mapmot, securing debt in the principal sum of $400,000 (Mortgage 1). (United States Ex. 11). On August 30, 1988, H.F. Investors Inc. acquired a mortgage on the real property owned by the Debtor and his wife located at 7702 82nd Street, Brooklyn, New York (the "Brooklyn Premises") given by the Debtor and Joan Maghazeh, "solely as collateral security for a mortgage dated August 30, 1988 ('Mortgage 1') in the sum of $400,000 made by Mapmot

Realty Associates to H.F. Investors Inc., covering [the Mapmot Building], being recorded simultaneously at the Register of Kings County." ("Collateral Mortgage 1"). (United States Ex. 12).

No note was executed in connection with Collateral Mortgage 1. (United States Ex. 12).

On October 30, 1990, Hamilton Savings and Loan Association acquired an interest in Mortgage 1 and Collateral Mortgage 1 by assignment from H.F. Investors, Inc. (United States Ex. 13). Home Federal Savings Bank acquired an interest in Mortgage 1 and Collateral Mortgage 1 as successor by merger to Hamilton Federal Savings, F.A., formerly known as Hamilton Federal Savings and Loan Association. (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar Management Limited Partnership ("Danmar LP")[3] acquired an interest in Mortgage 1 and Collateral Mortgage 1 by assignment from Home Federal Savings Bank. (United States Ex. 14). Pursuant to an Assignment of Mortgage and Indemnification Agreement dated February 25, 1997, and an instrument titled "Assignment of Mortgage," the Maghazeh Trust acquired an interest in Collateral Mortgage 1. (United States Exs. 15, 17).

### 4. *Facts Related to Mortgage 2 and Collateral Mortgage 2.*

On September 16, 1988, H.F. Investors Inc. acquired a mortgage on the Mapmot Building given by Mapmot, securing debt in the principal sum of $99,000.00 ("Mortgage 2"). (United States Ex. 18).

On September 16, 1988, H.F. Investors acquired a mortgage on the Brooklyn Premises, given by Paul Maghazeh and

---

**3.** Danmar LP is a partnership comprised of A. Hassan Mohaideen's wife Laurie Mohaideen,

his son Ahamed Mohaideen and his daughter Miriam Mohaideen.

Joan Maghazeh, "given solely as collateral security for a mortgage dated September 16, 1988 [Mortgage 2] in the sum of $99,990.00 made by [Mapmot] to H.F. Investors covering Block 1036, Lot 19, Tax Map of Kings County a/k/a 348–356 13th Street, Brooklyn, New York, being recorded simultaneously at the Register of Kings County." (United States Ex. 19).

No note was executed in connection with Collateral Mortgage 2.

On October 30, 1990, Hamilton Savings and Loan Association acquired an interest in Mortgage 2 and Collateral Mortgage 2 by assignment from H.F. Investors, Inc. (United States Ex. 13). Home Federal Savings Bank acquired an interest in Mortgage 2 and Collateral Mortgage 2 as successor by merger to Hamilton Federal Savings, F.A., formerly known as Hamilton Federal Savings and Loan Association. (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar LP acquired an interest in Mortgage 2 and Collateral Mortgage 2 by assignment from Home Federal Savings Bank. (United States Ex. 14). Pursuant to an Assignment of Mortgage and Indemnification Agreement dated February 25, 1997, and an instrument titled "Assignment of Mortgage," the Maghazeh Trust acquired an interest in Collateral Mortgage 2. (United States Exs. 15, 17).

### 5. Facts Related to Mortgage 3.

On May 23, 1989, Hamilton Federal Savings and Loan Association acquired a mortgage on the Mapmot Building, given by Mapmot, securing debt in the principal sum of $1,550,000.00 ("Mortgage 3"). (United States Ex. 20). Home Federal Savings Bank acquired an interest in Mortgage 3 as successor by merger to Hamilton Federal Savings, F.A., formerly known as Hamilton Federal Savings and Loan Association. (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar LP acquired an interest in Mortgage 3 by assignment from Home Federal Savings Bank. (United States Ex. 21).

### 6. Facts Related to Mortgage 4.

On July 27, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Mapmot Building, given by Mapmot, securing debt in the principal sum of $130,000 ("Mortgage 4"). (United States Ex. 22). Home Federal Savings Bank acquired an interest in Mortgage 4 as successor by merger to Hamilton Federal Savings, F.A., formerly known as Hamilton Federal Savings and Loan Association. (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar LP acquired an interest in Mortgage 4 by assignment from Home Federal Savings Bank. (United States Ex. 21).

### 7. Facts Related to Mortgage 5.

On August 20, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Mapmot Building, given by Mapmot, securing debt in the principal sum of $100,000.00, which was consolidated with Mortgages 3 and 4, "so as to form a single valid first lien of $1,780,000.00." ("Mortgage 5"). (United States Ex. 23). Home Federal Savings Bank acquired an interest in Mortgage 5 as successor by merger to Hamilton Federal Savings Bank, F.A., formerly known as Hamilton Federal Savings and Loan Association. (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar LP acquired an interest in Mortgage 5 by assignment from Home Federal Savings Bank. (United States Ex. 21).

8. *Facts related to Mortgage 6 and Collateral Mortgage 3.*

On October 30, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Mapmot Building, given by Mapmot, securing debt in the principal sum of $220,000, which was consolidated with Mortgages 3, 4 and 5 "to form a single lien of $2,000,000.00." ("Mortgage 6"). (United States Ex. 24). On October 30, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Brooklyn Premises, given by Paul and Joan Maghazeh, "given solely as collateral security for a loan in the consolidated principal balance of $2,000,000.00 dated October 30, 1990 [Mortgage 6] in the sum of $2,000,000.00 made by [Mapmot] to Hamilton Federal Savings and Loan Association on Block 1036 Lot 19, Kings County." ("Collateral Mortgage 3"). (United States Ex. 25).

No note was executed in connection with Collateral Mortgage 3. Home Federal Savings Bank acquired an interest in Mortgage 6 and Collateral Mortgage 3 as successor by merger to Hamilton Federal Savings, F.A., formerly known as Hamilton Federal Savings and Loan Association (United States Ex. 17).

By instrument of assignment dated September 29, 1995, Danmar LP acquired an interest in Mortgage 6 and Collateral Mortgage 3 (United States Ex. 21). Pursuant to an Assignment of Mortgage and Indemnification Agreement dated February 25, 1997, and an instrument titled "Assignment of Mortgage," the Maghazeh Trust acquired an interest in Collateral Mortgage 3 (United States Exs. 15, 17).

9. *Facts Related to Mortgage 7 and Collateral Mortgage 4.*

On October 30, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Mapmot Building, given by Mapmot, securing debt in the principal sum of $50,010.00 which was consolidated with Mortgages 1 and 2, "to form a single lien of $550,000." ("Mortgage 7"). (United States Ex. 26). On October 30, 1990, Hamilton Federal Savings and Loan Association acquired a mortgage on the Brooklyn Premises, given by the Debtor and Joan Maghazeh, "given solely as collateral security for a loan in the consolidated principal balance of $2,000,000.00 dated 10/30/90 [Mortgage 7] in the sum of $550,000.00 made by [Mapmot] to Hamilton Federal Savings and Loan Ass'n on Block 1036, Lot 19, Kings County" ("Collateral Mortgage 4"). (United States Ex. 27).

No note was executed in connection with Collateral Mortgage 4. Home Federal Savings Bank acquired an interest in Mortgage 7 and Collateral Mortgage 4 as successor by merger to Hamilton Federal Savings, F.A., f/k/a Hamilton Federal Savings and Loan Association (United States Ex. 17). By instrument titled "Assignment of Mortgage" dated September 29, 1995, Danmar LP acquired an interest in Mortgage 7 and Collateral Mortgage 4 (United States Ex. 21). Pursuant to "Assignment of Mortgage and Indemnification Agreement" dated February 25, 1997, and an instrument titled "Assignment of Mortgage," the Maghazeh Trust acquired an interest in Collateral Mortgage 4. (United States Exs. 15, 17).

10. *Prior Bankruptcy Petitions filed by the Debtor, A. Hassan Mohaideen and other Related Entities.*

In late 1991 or early 1992, Mapmot was having difficulty paying certain loans related to the Mapmot Building, and went into default. (United States Ex. 38). Mapmot filed a petition for relief under Chapter 7 of the Bankruptcy Code in 1993, and on March 18, 1996, Richard Stern, Esq., the

Chapter 7 Trustee for this case, filed a Report of No Distribution.

Empire filed a petition for relief under Chapter 11 of the Bankruptcy Code on April 29, 1993. The case was later converted to a case under Chapter 7 of the Bankruptcy Code. Mapmot and Empire were in financial distress about the same time that the Debtor created the Trust for the benefit of the children.

A. Hassan Mohaideen filed a petition for relief under Chapter 7 of the Bankruptcy Code on April 11, 1994 in the Bankruptcy Court for the Middle District of Florida. Thereafter, venue was transferred to this Court and Neil Ackerman, Esq. was appointed Chapter 7 Trustee. Several creditors, including Home Federal Savings Bank filed complaints objecting to the discharge of Mohaideen, and Neil Ackerman became embroiled in a bitter dispute with Mohaideen regarding Mohaideen's refusal to produce certain documents. Ultimately, the bankruptcy case was dismissed by order dated December 27, 1995, upon motion by Mr. Ackerman representing that practically all of the creditors had settled with Mohaideen by having their claims paid by Danmar LP or other relatives of Mohaideen. Included in the settlements was Danmar LP's payment of $1.55 million to Home Federal Savings Bank for the assignment to it of certain mortgages, including Mortgages 1 through 7 and Collateral Mortgages 1 through 4.

The Debtor filed a petition for relief under Chapter 7 on August 8, 1995. R. Kenneth Barnard was appointed interim trustee and thereafter duly qualified as the permanent Trustee. On May 12, 1997, Barnard filed a motion seeking approval of a compromise and settlement in the Debtor's first case whereby Danmar LP would assign Collateral Mortgages 1 through 4 to the Maghazeh Trust in exchange for 1) $50,000 and 2) the Debtor's assignment of his 42.5% partnership interest in Mapmot to Danmar LP. At this time, the Debtor's interest in Mapmot was little or none as the Trustee of Mapmot's Chapter 7 case had filed a no asset report. In his application, Barnard states that the Debtor represents that the Maghazeh Trust was created in 1992 for the benefit of the Debtor's children, and that the Maghazeh Trust was making the life insurance premium payments. Barnard further states that the Debtor represents that he has no interest in the Trust and that the $50,000 came from the Maghazeh Trust, not the Debtor. This now appears to have been a false representation; a lie. At the initial hearing on that motion the Court found that service was insufficient, and directed Barnard to serve all creditors and parties in interest with the motion. Barnard did so, and at the adjourned hearing, after receiving no opposition to the motion, the Court granted the requested relief. The February 25, 1997 Assignment Agreement and the Stipulation filed with the Court state that the $50,000 consideration would be paid by the Maghazeh Trust. (United States Exs. 15, 34, 35).[4]

Despite the representations made to the Court, the Debtor in fact paid $50,000 out of his own personal funds to his attorney, Victor Deutch, which was paid to the Danmar LP, in consideration for the assignment of Collateral Mortgages 1 through 4 to the Maghazeh Trust. (United States Ex. 36). The money never came from the Maghazeh Trust, nor was it even funneled through the Maghazeh Trust. Victor Deutch represented the Debtor and the Maghazeh Trust in connection with the

---

**4.** It is not clear whether the Debtor had this $50,000 prepetition, but had not revealed it in his Chapter 7 case, or whether he acquired these funds postpetition, after August 8, 1995.

assignment of Collateral Mortgages 1 through 4 to the Maghazeh Trust, and according to Mr. Deutch, both parties waived any potential conflict of interest inherent in the dual representation. (Declaration of Victor Deutch, p. 5).

Thereafter, Barnard filed a final report on August 19, 1998 and the Debtor's first case was closed. The Assignment of Mortgage dated February 25, 1997 issued by Danmar LP states that "The assignee [the Maghazeh Trust] is not acting as nominee of the mortgagor or owner of the property and the mortgage continues to secure a bona fide obligation." (United States Ex. 17). This statement comes from Danmar LP, not from the Trust. It is questionable as to how Danmar LP can make a representation on behalf of the Trust as to the Trust's relation to the mortgagor or the owner of the property.

With regard to the circumstances surrounding the purchase of the mortgages by the Maghazeh Trust, the Debtor testified that it was done in order to keep the creditors from foreclosing on his property. (United States Ex. 36, pp. 82, 83). The Debtor also indicated that with regard to the Maghazeh Trust and its rights pursuant to the assignment of the collateral mortgages, "[i]t is not necessary that they will foreclose on the two houses. They are my children." (United States Ex. 36 p. 86). At the same time, the Debtor stated that he cannot control the trust, but "they are my children, let's face it. If they foreclose it, if they do and they decided, that is their power. I am not saying that I will have any influence. They could sell my one house and we could all live in the other house. I am their father. They are not going to put me on the street.... The children, what they do, I have no power on them, but still I am their father." (United States Ex. 36, p. 87).

Victor Deutch, the Debtor's former counsel, testified that it was Deutch's idea to assign Collateral Mortgages 1 through 4 to the Maghazeh Trust, as a "means of protecting Maghazeh who was in bankruptcy." (United States Ex. 41, p. 30).

Paul Maghazeh, Jr., the trustee of the Maghazeh Trust, testified in a deposition that he executed a demand note on behalf of the Maghazeh Family Trust, in the amount of $50,000 to the Debtor as payee. Lisa Maghazeh, the other trustee of the Maghazeh Family Trust, did not sign the note. The $50,000 demand note is not listed as an asset on the Debtor's current bankruptcy schedules and the Maghazeh Trust has never paid anything to the Debtor towards the demand note. The trustees of the Maghazeh Trust have made no payment for any of the assets acquired by the Trust. All payments came from the Debtor.

11.  *The Debtor's Current Case.*

The Debtor's current petition was filed on October 26, 2001 under Chapter 11. The case was converted to a case under Chapter 7 on March 15, 2002 following a motion filed by the Office of the United States Trustee seeking to convert or dismiss the case. On March 18, 2002, Marc Pergament was appointed as the Chapter 7 Trustee (the "Trustee").

Pursuant to an order of this Court dated June 18, 2002, the Trustee sold the Brooklyn Premises for $1,615,000. From those sales proceeds the following sums were paid:

a.  John Maguire Real Estate (real estate broker)—$64,600.00;

b.  JPMorgan Chase Bank (first mortgage)—$145,155.08;

c.  New York City Department of Finance (transfer tax)—$23,013.75;

14

d. Debtor (homestead exemption)—$10,000;

e. Craig Eaton (reimbursement of bidder's costs)—$1,575,00; and

f. capital gains taxes (IRS and NYS Department of Tax)—$244,926.00.

The available net proceeds from the sale of the Brooklyn Premises is the sum of $1,125,730.30. The amount owed to the Maghazeh Trust with respect to the mortgages recorded against the Brooklyn Premises is $1,746,766.10.

Pursuant to order of this Court of November 2002, the Trustee sold the Cutchogue Premises for $4,015,000. From the proceeds of the Cutchogue Premises, the Trustee disbursed the following sums:

a. JPMorgan Chase Bank (first mortgage)—$517,626.36;

b. Van Cleef Realty (broker's commission)—$160,400.00; and

c. capital gains taxes (IRS and NYS Department of Tax)—$818,295.00.

The available net proceeds from the sale of the Cutchogue Premises is $ 2,518,678.64.

The Trustee commenced this adversary proceeding requesting an order and judgment determining the priority and rights of each of the named defendants with respect to the net proceeds of the sale of the Brooklyn Premises and the priority and rights of each of the named defendants with respect to the Cutchogue Premises, and awarding the Trustee fees and costs incurred in connection with this adversary proceeding. Answers were filed by the Magazeh Trust, the IRS, JP Morgan Chase and Cobble Resources, Inc. The Answer of Cobble Resources Inc. includes cross-claims against the Magazeh Trust. By order dated November 19, 2003, the

alleged mortgages and judgment liens filed by Bay Ridge Savings and Loan Association, H.F. Investors, Inc., Joan R. Addrizzo, M.D., Chitoor Governdarraj, M.D.P.C. Retirement Trust, Hamilton Federal Savings and Loan Association, Danmar Management Limited Partnership, Eaton Financial Corporation, Zimmer, Victor & Bernstein, Nirmala Batheja and The Bank of New York, North Fork Bank, Home Federal Savings Bank and the NYS Department of Tax as to either/or the Brooklyn Premises and the Cutchogue Premises were dismissed.

The amount owed to the Magazeh Trust with respect to the mortgages recorded against the Cutchogue Premises is the sum of $1,946,037.37. That sum is separate from the sums the Magazeh Trust claims it is owed from mortgages assigned to it related to the Brooklyn Premises. Pursuant to the Trustee's calculations, Cobble Resources, Inc., as assignee of two judgments against the Brooklyn Premises and the Cutchogue Premises is entitled to the sum of $342,730.01. The United States does not have a lien with respect to the Cutchogue premises, but has filed a claim in this case.

The Trustee moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure for an order and judgment declaring that: (a) with respect to the Brooklyn Premises, the net proceeds be disbursed to the Magazeh Trust; (b) with respect to the Cutchogue Premises, that the net sales proceeds be disbursed as follows: (i) $1,946,037.37 to the Magazeh Trust [5], (ii) $342,730.01 to Cobble Resources, Inc.; and (c) the claims of the IRS and NYS Depart-

5. Although the Trustee states that he takes no position regarding the dispute between the Maghazeh Trust and the United States over the validity of the Maghazeh Trust, he clearly recognizes its legitimacy by virtue of his motion for summary judgment seeking to pay the Maghazeh Trust on the mortgages.

ment of Tax be reclassified in accordance with § 507 of the Bankruptcy Code to unsecured priority claims.

The United States cross-moves for summary judgment, declaring that the Magazeh Trust is the alter ego of the Debtor and, consequently, the Maghazeh Trust's claim in this case has no value by reason of the doctrine of merger and/or because the collateral mortgages on which they are based were released to the Debtor, thus extinguishing the debt. The United States also seeks entry of an order declaring that the IRS has valid and subsisting federal tax liens on the proceeds from the sale of the Brooklyn Premises for the Debtor's federal income tax liabilities for the years ended December 31, 1992 through December 31, 1998, in the amount of $679,536.03 plus statutory interest from the dates of assessment, and for the Debtor's trust fund recovery penalty liabilities for each quarter commencing December 31, 1990 through September 30, 1992 in the amount of $145,320.08, plus statutory interest from the date of assessment, and that the net proceeds from the sale of the Brooklyn Premises should be disbursed to the IRS.

## DISCUSSION

### 1. Standard for Summary Judgment.

Fed.R.Civ.P. 56, made applicable to bankruptcy proceedings through Fed.R. Bankr.P. 7056, states in part that:

> the judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The Court is charged with "discerning whether there are any genuine issues of material fact to be tried, not to decide them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *B.F.Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). Summary judgment will be denied where specific facts are adduced indicating a genuine issue for trial. *See generally Celotex Corp. v. Catrett,* 477 U.S. at 322–27, 106 S.Ct. at 2551–55; *Anderson v. Liberty Lobby Inc.,* 477 U.S. at 247–52, 106 S.Ct. at 2506–11.

The moving party has the burden of convincing the court of the absence of any genuine issue relating to any material fact. *In re Rodolitz,* 206 B.R. 657, 661 (Bankr. E.D.N.Y.1997), *aff'd, Rodolitz v. Bel Canto Fancy Foods, Ltd.,* 232 B.R. 573 (E.D.N.Y. 1999). The court must look to the evidence on the record and draw inferences as they most favor the opposing party. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). When the moving party meets its burden, "the opposing party must not only set forth specific facts showing there is a genuine issue for trial, but also that the disputed fact is material." *In re Royal Business School, Inc.,* 157 B.R. 932, 937 (Bankr.E.D.N.Y.1993).

The Court finds that summary judgment is appropriate in this case as no issue of material fact has been raised as a bar to the motion in regard to whether the Maghazeh Trust is the alter ego of the Debtor.

### 2. Alter Ego Theory.

The United States argues that the Maghazeh Trust is the alter ego of the Debt-

or, and that as a result, the Debtor's interest in the Brooklyn Premises and the Cutchogue Property are merged with the Collateral Mortgages 1, 2, 3 and 4. In order to analyze this issue, the Court must first examine the alter ego theory, and determine whether it can be applied to the Maghazeh Trust to bring Collateral Mortgages 1 though 4 into the Debtor's estate.

As the Court of Appeals for the Second Circuit has recognized, the question of whether the "alter ego theory" of corporations applies to trusts is a matter of state law. *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85 (2nd Cir.2003). The Second Circuit has not conclusively resolved the issue of whether a trust may be pierced under New York law. However, the Second Circuit provides ample guidance for this Court to consider on this issue. In the *Vebeliunas* case, the Bankruptcy Court for the Southern District of New York was called on to determine whether two parcels of real property that were held in a trust were part of the estate of the debtor where the debtor misrepresented his ownership of one of the parcels of property. The Bankruptcy Court for the Southern District of New York found that the alter ego theory of piercing the corporate veil does not apply to trusts because they have no existence apart from the trustee and a trust cannot act on its own behalf. *Babitt v. Vebeliunas (In re Vebeliunas)*, 252 B.R. 878, 887, (Bankr. S.D.N.Y.2000), *aff'd, in part, rev'd, in part*, 2002 WL 115656, 2002 U.S. Dist. Lexis 1271 (S.D.N.Y.2002), *rev'd*, 332 F.3d 85 (2d Cir.2003).

The District Court for the Southern District of New York affirmed in part and reversed in part, holding that the alter ego theory did apply to the irrevocable trust as a matter of law and that the trustee's action to pierce the trust was proper. The District Court held that the debtor was the

alter ego of the irrevocable trust and exercised complete domination over the trust in that he and his family received the rents from the property held by the trust, and lived at the property held by the trust rent free. Furthermore, the debtor conveyed the real property to himself and then back to the trust despite the fact that the trust was irrevocable, and he deducted from his tax returns real estate taxes and interest expenses related to the property held by the trust, and represented to a bank that he had complete control over the "irrevocable" trust. Therefore, the District Court held that the real property held in the name of the trust was property of the debtor's estate. The debtor's wife, who created the trust and was the sole trustee, and who provided the consideration for the purchase of the real property conveyed to the trust, appealed from the decision of the District Court.

On appeal, the Court of Appeals for the Second Circuit acknowledged that there is no written opinion from the New York Court of Appeals regarding whether courts may disregard the form of a trust where the trust was not formed for an illegal purpose and there was a separation between the beneficiary and the trustee. The Second Circuit went on to discuss New York State court decisions regarding the right to pierce trusts, and found that New York courts would do so where the "respective parties used trusts to conceal assets or engage in fraudulent conveyances to shield funds from adverse judgments." *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d at 91. The Second Circuit did not find that piercing the trust was proper in the *Vebeliunas* case primarily because there was no evidence that the trust was used to conceal assets from the debtor's creditors. Furthermore, the debtor's wife purchased the assets of the trust with her own funds. In addition, the sharing of

assets between a married couple is routine and the court could not find that any evidence that the debtor exercised domination and control over the trust. *Id.* at 92.

■ In this case, although created at an earlier time, the Maghazeh Trust was used to engage in a fraudulent conveyance to shield the Debtor's interest in the mortgages purchased by the Debtor from Danmar LP. In other words, the Maghazeh Trust became a vehicle to shield the Debtor's assets from his creditors. In addition, all of the property owned by the Maghazeh Trust was funded by the Debtor.

New York case law provides additional guidance. One New York court has held that the alter ego theory can be asserted where a defendant fraudulently transfers property to a trust in order to thwart creditors. *Goldberg v. Goldberg,* 172 A.D.2d 316, 568 N.Y.S.2d 394 (1st·Dep't 1991). In *Posner v. S. Paul Posner 1976 Irrevocable Family Trust,* 260 A.D.2d 268, 688 N.Y.S.2d 548 (1st Dep't 1999) the appellate court reinstated a counterclaim based on alter ego where an intervenor alleged that the plaintiff transferred funds from a trust in an attempt to render it judgment-proof.

The alter-ego theory as it applies to trusts can be likened to fraudulent conveyance actions, where the transaction carries certain "badges of fraud" mandating a finding of intent to defraud. The Court of Appeals for the Second Circuit recognizes that "fraudulent intent is rarely susceptible to direct proof." *Salomon v. Kaiser*

*(In re Kaiser),* 722 F.2d 1574, 1582 (2d Cir.1983). Among the factors the Second Circuit has reviewed to discern intent to defraud in a transaction are 1) lack or inadequacy of consideration, 2) the family relationship between the parties in question, 3) the retention of benefit or use of the property in question, 4) the financial condition of the party being charged both before and after the transaction in question, 5) a course of conduct taken after the incurring of debt or the onset of financial difficulties, and 6) the general chronology of events in question. *Id.* at 1582–83. This Court finds that the badges of fraud contained herein are sufficient to support a finding that the Debtor intended to conceal his assets from creditors, and that piercing the veil of the Debtor's self-serving trust is mandated.

Federal tax cases further support application of the alter ego theory to trusts. In *United States v. Letscher,* 83 F.Supp.2d 367 (S.D.N.Y.1999), the District Court for the Southern District of New York found that a trust was the alter ego of the defendant taxpayer where the taxpayer used the assets of the trust for his own benefit and exercised dominion and authority over the account held by the trust. In *LiButti v. United States,* 107 F.3d 110 (2d Cir.1997), the Court of Appeals for the Second Circuit rejected the lower court's finding that alter ego analysis only applies to corporations. The Second Circuit recognized that the traditional factors used to determine whether to pierce the corporate veil [6] do

---

**6.** The factors which support a finding that an individual or another corporation controls a corporation to the extent that it is the alter ego of the dominating entity include:(1) disregard of corporate formalities, (2) inadequate capitalization, (3) whether the funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address

and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the dealings between the corporation and the individual are at arms length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) intermingling of property between the corporation and the do-

not directly apply in a non-corporate situation, but, nonetheless, a sole proprietorship could be deemed an alter ego of a defendant where he dominates and controls the entity in question. *Id.* at 119. Furthermore, evidence of dominance and control could be found where the child of the defendant, who was the nominal owner of the proprietorship, engaged in transactions at the behest of the defendant, and appeared to be subject to the defendant's "insidious domination." *Id.* at 120. The Second Circuit remanded the case to the District Court to make its findings based on these findings.

In this case, the Debtor treated the Maghazeh Trust as his alter ego in order to insulate his assets (Collateral Mortgages 1 through 4) from his creditors. The Debtor asserts that the facts clearly support a finding that the Maghazeh Trust was formed as part of the Debtor's estate planning following the death of his wife, and that the Maghazeh Trust maintained an existence separate from the Debtor, acting only through its named trustees. Even if the Court were to accept that the Maghazeh Trust was formed for proper purposes, the Debtor's subsequent treatment of the Maghazeh Trust as his own personal vehicle to shield his assets from his creditors and to perpetrate a fraud on this Court warrants piercing the Maghazeh Trust.

There are sufficient facts not in dispute to find as a matter of law that the Debtor controlled and dominated the Maghazeh Trust during the relevant time period. The Debtor contributed all of the assets the Maghazeh Trust ever owned. The Debtor used his own funds to purchase Collateral Mortgages 1 through 4 for the Maghazeh Trust. The only bank accounts

the Maghazeh Trust ever had were completely funded by the Debtor.

Lisa Maghazeh knows almost nothing about the Maghazeh Trust and Paul Maghazeh, Jr., knows very little about it as well. Paul Maghazeh, Jr., does not even know whether the Maghazeh Trust issued the check for the purchase of Collateral Mortgages 1 through 4, which is odd considering that these mortgages are the only assets of the Maghazeh Trust and Paul Maghazeh, Jr. indicated in his deposition that this trust was set up for the purpose of providing assets for himself and his sister. The Maghazeh Trust has never made a distribution to the beneficiaries, and there is no evidence that the Trustees took any action to enforce Collateral Mortgages 1 through 4, or that they took any action with respect to the Maghazeh Trust whatsoever. The Debtor's books and records are commingled with the records of the Maghazeh Trust and all of these documents are kept at the same location where all parties reside. The Trustees lived at the mortgaged premises, but made no attempt to collect any funds on behalf of the mortgages owned by the Trust.

The Debtor and the trustees of the Maghazeh Trust, who are the adult children of the Debtor, have lived together since 1988. Lisa Maghazeh has been financially dependent on the Debtor since 1988, and until very recently, the same was the case for Paul Maghazeh, Jr. The Debtor readily admits that it would have been "stupid" of him to purchase Collateral Mortgages 1 through 4 himself as his creditors could then execute on this asset. (United States Ex. 36, p. 82). The Debtor also admits that although he has no "legal" control over the Maghazeh Trust, the trustees are

minating entity. *Mag Portfolio Consult v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2nd Cir.2001).

his children who would not take any action which would put him in the street.

As the Second Circuit stated in *In re LiButti*, the inquiry is focused on who the true owner of the trust is. 107 F.3d at 120. The facts of this case support a finding that as a matter of law, the Debtor is the true owner of the Maghazeh Trust because every step taken by the Maghazeh Trust was taken by him directly or taken by his son at his request. The trustees had nothing to do with the decisions to fund the Maghazeh Trust or to place assets in the Maghazeh Trust, and the Debtor not only made all of the decisions for the Maghazeh Trust, but funded every asset it owned. The Debtor, as the sole provider of support for the trustees, was in a position to exert his domination over them. In addition, the trustees (his children) never took any action to foreclose on Collateral Mortgages 1 through 4 despite the fact that there was substantial equity in the Brooklyn Premises and the Cutchogue Premises after the first mortgages were satisfied. In short, there is no evidence to support a finding that the trustees acted in any way other than as nominees for the Debtor with respect to the Maghazeh Trust.

Once it is established that the Debtor dominated and controlled the Maghazeh Trust, the Court must find that the Debtor used his control of the Maghazeh Trust to commit a wrongful act. *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d at 91, 92 (citing *Freeman v. Complex Computing Co., Inc.*), 119 F.3d 1044, 1052 (2nd Cir. 1997) (other citations omitted). The wrongful act of the Debtor is clear and not subject to challenge. The Debtor used the Maghazeh Trust to perpetrate a fraud on this Court and to damage his creditors. In his prior bankruptcy case, the Debtor misrepresented to Mr. Barnard, the Chapter 7 Trustee, and to the Court, that the

funds to purchase the mortgages in question did *not* come from the Debtor personally. However, in spite of this representation, the Debtor used his own funds to purchase Collateral Mortgages 1 through 4 and transferred the mortgages to the Maghazeh Trust to shield these assets from his creditors. The Debtor admits this and as the Second Circuit held in *Babitt v. Vebeliunas (In re Vebeliunas)*, New York State courts permit the piercing of trusts where trusts are used to protect assets from the reach of creditors.

The Debtor continued this fraudulent charade when he failed to list on his Schedules in his current bankruptcy the note purporting to represent that the funds paid by the Debtor for the purchase of Collateral Mortgages 1 through 4 were a loan to the Maghazeh Trust. The Debtor never provided the truth regarding this transaction until this adversary proceeding was commenced. The Debtor's false statements coupled with his intent to shield these assets from his creditors, is unrefuted by the Maghazeh Trust, and there is no need to hold a hearing to elucidate matters further. The Court finds that the Maghazeh Trust is a sham.

There is sufficient evidence of fraud on the part of the Debtor for this Court to find that piercing the Maghazeh Trust is appropriate as a matter of law.

Once the Court finds that piercing the Maghazeh Trust is warranted and the Maghazeh Trust is the alter ego of the Debtor, the assets of the Trust become property of the Debtor's estate. As a result, the amount owed under Collateral Mortgages 1 through 4 shall be held by the Trustee and distributed by him, for the benefit of all creditors pursuant to the Bankruptcy Code.

### 3. *Merger doctrine.*

In its Cross–Motion, the United States seeks to have the Debtor's owner-

ship interest in the Brooklyn Premises and the Cutchogue Premises merged with Collateral Mortgages 1 through 4. Under real property law, a merger of interests in real property is accomplished when "two or more estates comprising the whole legal and equitable interest in property involved unite in the same person who then becomes the absolute owner." *Becker v. Snowden Development Corp.*, 66 Misc.2d 1060, 323 N.Y.S.2d 79, 82 (Cty.Ct.Broome Cty.1971); *Cambridge Factors, Inc. v. Thompson*, 215 A.D.2d 427, 626 N.Y.S.2d 259 (App.Div.2d Dept.1995). A merger may also be declared where "such declaration is required to protect the rights of a third person, such as the holder of a junior mortgage." *Id.* (Other citations omitted). In the *Cambridge Factors* case, the Appellate Division upheld a finding by the lower court that the defendant used aliases and alter egos to hold title to real property in one name and the first mortgage in the name of a sham corporation. The Appellate Division agreed that the defendant was perpetrating a fraud on the second mortgagee and that merger of the interests of the owner and the first mortgagee was appropriate. The Court need not address whether a merger has occurred because the net effect is the same as piercing the veil of the Maghazeh Trust. The assets of the Trust revert to the Debtor's estate. In any event, the creditors of the Debtor, including the United States, will obtain the benefit of Collateral Mortgages 1 through 4.

### 4. Status of IRS Claims.

In its Cross–Motion, the United States seeks entry of an order declaring that it has valid and subsisting federal tax liens on the proceeds from the sale of the Brooklyn Premises for the Debtor's federal income tax liabilities for the tax periods ended December 31, 1992, December 31, 1993, December 31, 1994, December 31, 1995, December 31, 1996, December 31, 1997 and December 31, 1998 in the amount of $679,536.03, plus statutory interest from the dates of assessment, and for the Debtor's Trust Fund Recovery Penalty liabilities for the periods ended December 31, 1990, March 31, 1991, June 30, 1991, September 30, 1991, December 31, 1991, March 31, 1992, June 30, 1992, and September 30, 1992 in the amount of $145,320.08, plus statutory interest from the dates of assessment.

Federal tax assessments are presumed correct and the taxpayer has the burden of establishing that the Commissioner's determination is incorrect and what his correct tax liability should be. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Unger v. Landau*, 155 F.3d 93, 101 (2d Cir.1998); *Lesser v. United States*, 368 F.2d 306, 310 (2d Cir.1966). The claim filed by the IRS is based on assessments made against the Debtor which the debtor refused or neglected to pay. On the date of each assessment, a federal tax lien arose under the provisions of 26 U.S.C. § 6321, and attached to all property and rights to property belonging to the Debtor. Notices of Federal Tax Liens with respect to the Debtor's tax liabilities have been duly filed against the Debtor with the King's County Register's Office in King's County, New York.

The Internal Revenue Service filed a proof of claim in this case claiming a secured claim of $1,384,722.50, as of the petition date, including the Debtor's federal Trust Fund Recovery Penalty Liability for the period ended September 30, 1992, and the Debtor's federal income tax liabilities for 1992 through 1998; an unsecured priority claim of $178,335.00, as of the petition date, including the Debtor's federal income tax liabilities for the 1999 and 2000 tax

years, and a penalty for the 1996 tax year; and an unsecured general claim in the amount of $51,522.64.

Neither the Trustee nor the Debtor object to this portion of the United States' Cross–Motion, and the Court finds that as a matter of law, the claims filed by the IRS are to be allowed and paid to the extent the Trustee has funds available from the sale of the Brooklyn Premises.

The Trustee herein requests authority to pay $342,730.01 to Cobble Resources. No one has objected. This request is granted.

After paying off all of the allowed claims securing an interest in either the Brooklyn Premises or the Cutchogue Premises, the Trustee shall file a report to the Court indicating how much funds remain from the sales of the two properties at issue and the total amount of claims remaining, if any, in this Debtor's estate.

The Court is not considering the other theories raised by the United States in this decision. To the extent that the Trustee has sufficient funds in hand to pay all claims in full, the remainder of the Motion and Cross–Motion will be rendered moot. The Court does not reach the issue of whether the underlying debt of the mortgages were satisfied as that issue would require a trial as to the material facts of those allegations. At this time, however, the Court need not pursue those issues. If there is a need for this adversary proceeding to continue further, the Court will fix a trial date after notice and hearing.

### CONCLUSION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

2. The portion of the Trustee's Motion seeking an order and judgment declaring that with respect to the Brooklyn Premises, the net proceeds be disbursed to the Maghazeh Trust is denied.

3. The portion of the United States' Cross Motion seeking an order declaring that the Maghazeh Trust is the alter ego of the Debtor is granted, and any funds the Maghazeh Trust seeks pursuant to Collateral Mortgages 1 through 4 are property of the Debtor's estate.

4. The portion of the Trustee's Motion seeking an order and judgment declaring that with respect to the Cutchogue Premises, the net proceeds be disbursed in the amount of $1,946,037.37 to the Maghazeh Trust and $342,730.01 to Cobble Resources is granted as to Cobble Resources only and denied as to the Maghazeh Trust.

5. The Trustee shall disburse the net funds from the sale of the Brooklyn Premises and the Cutchogue Premises consistent with the Bankruptcy Code and this decision, and shall file with the Court a report indicating the amount of funds remaining, if any, from the sale of the two properties, after payment to allowed secured and priority creditors, along with the total amount of general unsecured claims filed and unpaid to date.